[No. D061287. Fourth Dist., Div. One. Oct. 26, 2012.]

In re STEVEN C. MARTINEZ on Habeas Corpus.

COUNSEL

Law Office of Ken I. Karan and Ken I. Karan for Petitioner Steven C. Martinez.

Kamala D. Harris, Attorney General, Jennifer A. Neill, Assistant Attorney General, Phillip Lindsay and Michael Rhoads, Deputy Attorneys General, for Respondent the People.

OPINION

**HUFFMAN, Acting P. J.**—In this case, we interpret Penal Code[1] section 3550 and review the Board of Parole Hearing's (Board) denial of medical parole for Steven C. Martinez under that statute. This case presents a matter of first impression.

Martinez, an inmate in California State Prison, Corcoran, is a quadriplegic who requires 24-hour care. The Board denied him medical parole under section 3550. Section 3550, subdivision (a) provides the basic requirements for medical parole: "Notwithstanding any other provision of law, except as provided in subdivision (b), any prisoner who the head physician of the institution where the prisoner is located determines, as provided in this section, is permanently medically incapacitated with a medical condition that renders him or her permanently unable to perform activities of basic daily living, and results in the prisoner requiring 24-hour care, and that incapacitation did not exist at the time of sentencing, shall be granted medical parole if the Board of Parole Hearings determines that the conditions under which the prisoner would be released would not reasonably pose a threat to public safety."

Martinez brings this petition for writ of habeas corpus, challenging the Board's decision. He contends the Board abused its discretion when it found him to be a threat to public safety if granted medical parole. He asserts, considering his medical condition, the Board could not find that he would reasonably pose a threat to public safety if released. Martinez also argues the Board failed to carry out its mandatory duties under section 3550 because it did not establish satisfactory conditions for his medical parole.

In response, the Attorney General insists Martinez's despicable commitment crimes, his history of disciplinary problems in prison consisting primarily of disparaging comments and threats against female prison nurses, and his capability to use others to harm people provide "some evidence" to support the Board's decision.

---

[1] Statutory references are to the Penal Code unless otherwise specified.

We grant the requested relief because we conclude that there is no evidence showing that the conditions of Martinez's release would reasonably pose a threat to public safety. As a quadriplegic, the only way Martinez would be able to harm someone is by convincing another to do his bidding. The record does not contain any evidence showing that the conditions of Martinez's parole would provide an environment wherein he could reasonably pose a threat to public safety by convincing another person to hurt someone on his behalf. Put differently, "some evidence" must demonstrate that the conditions of his medical parole would create a situation wherein Martinez would be reasonably capable of using others to achieve any malevolent goals he may have, namely harming another. Here, the record falls far short of this essential requirement.

## FACTUAL AND PROCEDURAL BACKGROUND

Where appropriate, we borrow portions of the factual and procedural history from Martinez's most recent appeal. (See *Martinez v. Board of Parole Hearings* (2010) 183 Cal.App.4th 578 [107 Cal.Rptr.3d 439].)

### *Martinez's Commitment Crimes and Prison Injury*

"In March 1998, Martinez drove his car into two young women, pinning one beneath the vehicle. After grabbing the incapacitated woman by the throat and punching her in the face, breaking her nose, Martinez placed her in the backseat of the car and drove to a secluded location, where he forcibly committed various sexual acts upon the battered and bloodied woman. Convicted of forcible rape, forcible oral copulation, rape with a foreign object, assault with a deadly weapon, battery causing serious injury, hit and run causing injury, and kidnapping, he was sentenced to 165 years to life in state prison. The sentence was later reduced to 157 years to life." (*Martinez v. Board of Parole Hearings, supra*, 183 Cal.App.4th at p. 583.)

"In February 2001, while serving his sentence at Centinela State Prison, Martinez was attacked by two inmates and was stabbed in the neck. The knife wound lacerated Martinez's spinal cord, causing instant quadriplegia. He 'has no motor power whatsoever in his arms or legs,' 'is only able to move his head to a very minimal degree,' and does not have any control over his bowel or bladder movements. He will require '24-hour a day complete care for the rest of his life and has no chance of regaining any motor skills.' " (*Martinez v. Board of Parole Hearings, supra*, 183 Cal.App.4th at p. 583.)

### *The Board's Refusal to Recommend Recall for Martinez*

In 2008, the Board declined to refer Martinez to the sentencing trial court for recall under section 1170. In response, Martinez filed a complaint for

injunctive and declaratory relief and a petition for writ of mandate, asking the superior court to compel the Board to recommend recall of Martinez's sentence. (*Martinez v. Board of Parole Hearings, supra,* 183 Cal.App.4th at p. 585.) The court granted relief, and the Board appealed the ensuing judgment. The Third District Court of Appeal reversed the judgment in part, concluding that "some evidence" supported the Board's implied finding that, if released, Martinez could pose a threat to public safety. (*Id.* at p. 597.)

### The Medical Parole Proceeding

On May 24, 2011, the Board held a medical parole consideration hearing for Martinez. Martinez did not participate personally, but was represented by counsel during the hearing. The Board began by reciting Martinez's commitment crimes and noted that his medical condition satisfied the criteria for eligibility for medical parole. It then reviewed Martinez's many disciplinary issues, each memorialized in a California Department of Corrections and Rehabilitation form 115 rules violation report (CDC 115).

On one occasion, Martinez received a CDC 115 on March 1, 2003, after his interaction with a nurse and correctional officer while he was being fed. As the nurse was attempting to feed Martinez, he berated the correctional officer by saying: "You're a jackass. You're an asshole, a piece of shit." After this verbal attack, the nurse and correctional officer left Martinez, but they returned a few minutes later to finish feeding him. Martinez continued his verbal barrage: "You don't order anyone, jackass. I can do whatever I want. You are turning red. This pisses you off, don't it, asshole." When the correctional officer ordered Martinez to stop being disrespectful, Martinez responded by telling him, "You don't order me. You don't understand how important I am, do you, jackass. I'm going to sue you because you are so stupid you make it easy."[2]

In 2005, Martinez received a CDC 115 for behavior that could lead to violence. He was sitting on the toilet and asked for assistance. Two nurses responded, but Martinez refused their help and became disruptive. Martinez said, "You are incompetent and stupid. If you're not going to do what I say, then spin. You're an idiot, an asshole, and stupid. You obviously don't know who you're dealing with. You're one of the real smart ones, aren't you. You're lucky I can't walk." When the nurse asked Martinez what he meant, he replied, "I'd kick your ass."

---

[2] The March 1, 2003 CDC 115 was reduced from a serious classification to an administrative rule violation per California Code of Regulations, title 15, section 3313, subdivision (c)(2). (All further references to "Regulations" are to California Code of Regulations, title 15.)

In 2006, Martinez received another CDC 115 for being disrespectful to a nurse. This time he called the nurse an "obnoxious ghetto rat" and threatened to urinate on the hover lift if the nurse put her foot on it again.

In August 2009, he received a CDC 115 for disrespectful language. When a nurse ignored his comments, he stated, "Oh, you're ignoring me now after telling me you live in an apartment. By the way, did you tell your husband that you invited me to your apartment?" The nurse left the area, but later returned, which prompted Martinez to say, "The clock is ticking. I'm working on it. Next month is your last month, and you will be bye-bye."

Most recently, in February 2010, Martinez received a CDC 115 for again being belligerent toward staff. During this occasion, he told the nurse that "I don't have any respect for you. You're stupid, nasty, dirty, and disgusting."

In all, Martinez received 10 CDC 115's from 2003 through 2010. Seven of the CDC 115's involved Martinez being disrespectful toward staff. He also received a CDC 115 for a violation of grooming standards, one for behavior that could lead to violence, and another for over-familiarity with staff. The majority of the rules report violations involved female staff.

The Board also observed Martinez received over 40 disciplinary chronos (CDC 128). For example, Martinez received a CDC 128 when he told a nurse, "I'll be out of here real soon, and you won't like what happens when I do get out. You saw I got [specific correctional officer] out of here. I no longer have to look at him, hear him, or smell him. I was the one who got rid of him. If I can do that, you won't like what I can do after I get out of here. I'm taking the state for every penny I can." Many of the CDC 128's involved disputes between Martinez and a specific correctional officer. On one occasion, Martinez apparently told the correctional officer that when he won his money and got out of prison, the correctional officer better watch out for his wife because he was going to visit her. The Board commented it was "obvious" there was some "animosity" between Martinez and the subject correctional officer.

During the medical parole hearing, Martinez's counsel objected to the CDC 115's. He argued the CDC 115's were unreliable and that Martinez had appealed most, if not all, of them. Martinez's counsel did not attempt to justify Martinez's commitment crimes, but stressed that Martinez did not receive any CDC 115's prior to becoming a quadriplegic. He admitted Martinez's behavior while incarcerated was far from perfect, but emphasized the root of his behavior problems was Martinez's total dependence on prison staff for all his needs, which were not being adequately met. In other words, Martinez's counsel asserted Martinez lashed out at prison staff to protect

himself because he was receiving poor treatment and being abused by prison staff. Martinez also was suffering from posttraumatic stress disorder, which negatively affected his behavior.

Martinez's attorney presented the Board with a packet of material, which the Board marked as "Exhibit 1." The packet included a letter to Laura Schaper, SRNIII, Inpatient Nursing Services from the John D. Clarich Memorial Hospital Nursing Staff. The letter included over 40 signatures. The Board read the letter into the record. It stated in pertinent part: "The acceptance of [inmate] Martinez by CSP [Corcoran] per Sacramento four years ago has put much undue stress on the staff. His conditions of care are unmatched by any other inmate/patient. [¶] . . . [¶] . . . No other patient ever receives his own nurse. Now two licensed personnel and a supervisor have to be present each time his cell is entered because of his constant threats to the staff. This is causing a hostile work environment. How much farther will we continue to bend? His offense was against women, and he continues to offend, only now it is psychological rape and the staff are his victims. . . . [Inmate] Martinez has repeatedly terrorized and threatened the staff with the loss of their jobs and homes. [¶] . . . [¶] It is time that all special and unnecessary treatment be stopped immediately. . . . No society in the world should allow this kind of treatment to continue. No prisoner in the state, country or world should ever receive the special treatment this [inmate] receives. . . ."

Martinez's counsel also gave examples of Martinez's poor treatment in prison. He explained that Martinez was rushed to the hospital because he was improperly medicated. Also, Martinez's counsel noted that Martinez had recently developed a stage three pressure ulcer.

A deputy district attorney provided closing remarks to the Board, emphasizing that the district attorney's office opposed medical parole for Martinez. He discussed Martinez's commitment crimes, stating that Martinez "has shown that he is willing to use the most deplorable, forcible and hideous acts against females that are ever imaginable." The deputy district attorney linked the circumstances of Martinez's commitment crime with his criminal history[3] and record of harassing prison staff to underscore that Martinez's medical parole would present a reasonable threat to public safety. He also read

---

[3] The Board did not focus on Martinez's criminal history beyond his commitment crimes. Nevertheless, Martinez "had 'an extensive arrest history dating back to 1987 and consist[ing] of arrests for Receiving Stolen Property, Carrying a Loaded Firearm in Public, Carrying a Concealed Weapon, Obstructing/Resisting a Public Officer, Assault with a Deadly Weapon, Battery, [and] Damage of Power Lines . . . .' " (*Martinez v. Board of Parole Hearings, supra,* 183 Cal.App.4th at p. 594.)

extensively from *Martinez v. Board of Parole Hearings, supra*, 183 Cal.App.4th 578 to fortify his conclusion that Martinez should not be released.

In response to the deputy district attorney's remarks, Martinez's attorney stressed that Martinez's primary concern is his health, and because of his condition, he does not present a reasonable threat to the public if released. He further underscored that Martinez was precisely the type of inmate section 3550 was meant to cover.

After taking a "long time" to make a decision and acknowledging that Martinez presented a "tough decision," the Board decided "the condition under which the inmate would be released poses an unreasonable threat to public safety." The Board based its decision on Martinez's record of harassing and threatening prison staff and his commitment crimes. The Board reasoned, "Mr. Martinez's pattern of conduct, notwithstanding his physical condition, indicates to this Panel that he remains a violent person who is capable of using others to carry out his threats, and that he would also be a public safety threat to those who attend him outside the prison walls."

Martinez subsequently filed a petition for a writ of habeas corpus in superior court. The superior court denied the petition. Martinez then filed a petition for a writ of habeas corpus in this court. We issued an order to show cause why relief should not be granted. The Attorney General filed a return, and Martinez filed a traverse.

### DISCUSSION

### I

### *THIS CASE IS PROPERLY BEFORE THIS COURT*

Martinez committed his crimes in San Diego County. He was tried and convicted by a jury in San Diego County Superior Court. He appealed his conviction and sentence to this court. (See *People v. Martinez* (Sept. 20, 2000, D032610) [nonpub. opn.], review denied Nov. 29, 2000, S092193.)

However, Martinez is currently an inmate at Corcoran, which is located in Kings County. Kings County falls in the Fifth Appellate District. After the Board declined to grant him medical parole under section 3550, Martinez filed a petition for a writ of habeas corpus in San Diego County Superior Court, which was denied. Martinez then filed a petition for a writ of habeas corpus here in the Fourth Appellate District.

"[G]enerally speaking a petition for writ of habeas corpus should not be transferred to another court unless a substantial reason exists for such transfer. In general, a habeas corpus petition should be heard and resolved by the court in which the petition is filed." (*In re Roberts* (2005) 36 Cal.4th 575, 585 [31 Cal.Rptr.3d 458, 115 P.3d 1121] (*Roberts*).)

Petitions that raise challenges based primarily on facts occurring outside an appellate district, including petitions that question the conditions of confinement or the conduct of correctional officials, are usually filed in the corresponding appellate district where the inmate is housed. (*Roberts, supra,* 36 Cal.4th at pp. 586–588; Cal. Rules of Court, rule 8.385(c)(1)(B).) Petitions that challenge the judgment or sentence are properly filed in the district where the inmate was sentenced. (*Roberts, supra,* at pp. 586–588.) The Supreme Court explained that "in making a parole-related determination the conduct of the Board is not the equivalent of conduct of individual correctional officials. In procedural and substantive terms, this type of determination is more analogous to the sentencing determination made by the court in the county where the judgment was rendered than it is to a decision affecting confinement." (*Id.* at pp. 587–588.) Thus, the Supreme Court has "direct[ed] that a petitioner who seeks to challenge by means of habeas corpus the denial of parole (or his or her suitability for parole) should file the petition in the superior court located in the county in which the conviction and sentence arose, and that the petition should be adjudicated in that venue." (*Id.* at p. 593.)

Here, Martinez challenges the Board's denial of medical parole. Because Martinez was tried and sentenced in San Diego County Superior Court, we are the proper court to hear this matter. (See *Roberts, supra,* 36 Cal.4th at p. 593.)

II

*THE MEDICAL PAROLE STATUTE*

The interpretation of section 3550 is a question of law that we review de novo. (*People ex rel. Lockyer v. Shamrock Foods Co.* (2000) 24 Cal.4th 415, 432 [101 Cal.Rptr.2d 200, 11 P.3d 956].) In construing statutes, we determine and effectuate legislative intent. (*People v. Woodhead* (1987) 43 Cal.3d 1002, 1007 [239 Cal.Rptr. 656, 741 P.2d 154]; *People ex rel. Younger v. Superior Court* (1976) 16 Cal.3d 30, 40 [127 Cal.Rptr. 122, 544 P.2d 1322].) To ascertain intent, we look first to the words of the statutes. (*Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1386–1387 [241 Cal.Rptr. 67, 743 P.2d 1323]; *Woodhead, supra,* at p. 1007.) "Words

must be construed in context, and statutes must be harmonized, both internally and with each other, to the extent possible." (*California Mfrs. Assn. v. Public Utilities Com.* (1979) 24 Cal.3d 836, 844 [157 Cal.Rptr. 676, 598 P.2d 836].)

■ Section 3550 was introduced as Senate Bill No. 1399 (2009–2010 Reg. Sess.) (Senate Bill No. 1399) and became effective January 1, 2011. It allows for the parole of prisoners who were not sentenced to death or life without parole, are medically incapacitated, and would not reasonably pose a threat to public safety. (§ 3550.)

An inmate meets the medical criteria for medical parole if the "head physician of the institution where the prisoner is located" determines the inmate is "permanently medically incapacitated with a medical condition that renders him or her permanently unable to perform activities of basic daily living, and results in the prisoner requiring 24-hour care, and that incapacitation did not exist at the time of the sentencing." (§ 3550, subd. (a); see Regs., § 3359.1, subd. (a)(1), (2).) After such a determination is made, the inmate is referred to the Board. (§ 3550, subd. (a); Regs., § 3359.1, subd. (a).) The Board makes an "independent judgment regarding whether the conditions under which the inmate would be released pose a reasonable threat to public safety, and [prepares] written findings related thereto." (§ 3550, subd. (g).)

■ Section 3550 also provides the Board with the authority to "impose any reasonable conditions on prisoners subject to medical parole supervision . . . including, but not limited to, the requirement that the parolee submit to electronic monitoring." (§ 3550, subd. (h).) In addition, "the parolee may be required to submit to an examination by a physician selected by the board for the purpose of diagnosing the parolee's current medical condition." (*Ibid.*) The physician shall provide the Board with a report, and if the Board determines the parolee's medical condition improves to the extent that he no longer qualifies for medical parole, the Board shall return the parolee to the custody of California's Department of Corrections and Rehabilitation (CDCR). (*Ibid.*)

The Legislature enacted section 3550 to reduce the fiscal burden placed on the state by caring for medically incapacitated inmates. (Sen. Com. on Public Safety, Analysis of Senate Bill No. 1399 (2009–2010 Reg. Sess.) as amended Apr. 14, 2010 (Analysis of Senate Bill No. 1399).) The Legislature also mentioned that section 3550 still makes "public safety paramount." (Analysis of Sen. Bill No. 1399, *supra*, at p. 11.)

In the process of passing section 3550, the Legislature used section 1170 as the baseline "existing law." (Analysis of Sen. Bill No. 1399, *supra*, at pp. 3–5;

Sen. Rule Com., Office of Sen. Floor Analyses, 3d reading analysis of Sen. Bill No. 1399 (2009–2010 Reg. Sess.) as amended May 20, 2010, pp. 1–3.) Under section 1170, either the CDCR or the Board may recommend to the court that an inmate's sentence be recalled if the inmate's physical condition satisfies certain criteria and "[t]he conditions under which the prisoner would be released or receive treatment do not pose a threat to public safety." (§ 1170, subd. (e).) The Legislature stated that section 3550 addressed "some of the issues that have been identified as problematic in [section 1170]." (Analysis of Sen. Bill No. 1399, *supra,* at p. 11.) Specifically, "[r]ather than requiring a sentence recall it creates an alternative procedure that permits these inmates to be placed on parole supervision under conditions determined by the parole board, and allows the parole to be revoked if for any reason the parolee's condition changes and creates a danger to the public." (*Ibid.*) In addition, the Legislature indicated that section 3550 would provide easier criteria from which to determine if an inmate qualifies medically for parole. (Analysis of Sen. Bill No. 1399.)

In discussing Senate Bill No. 1399, the Legislature expressed frustration that, since the enactment of section 1170, releases of inmates from prison on medical grounds had not increased, with only two inmates having their sentences recalled under the statute in 2009. (Analysis of Sen. Bill No. 1399, *supra,* at p. 10 ["However, last year only two such releases were approved and we continue to incarcerate inmates who could, by any rational standard, be released without posing a threat to the public."]

Based on the language of the statute and its legislative history, it is clear the Legislature drafted section 3550 primarily to alleviate some of the financial burden facing the CDCR in caring for inmates suffering from certain medical conditions. Further, the Legislature wanted to create a mechanism that increases the number of inmates being released from prison as compared to the few released under section 1170. These inmates would be released, subject to appropriate conditions of parole, if they are "permanently medically incapacitated" and "the conditions under which the prisoner would be released would not reasonably pose a threat to public safety." (§ 3550, subd. (a).) It is the Legislature's use of the word "reasonably" that is the focus of the parties' dispute in this matter.

Martinez argues that the Legislature's inclusion of the word "reasonably" in section 3550, subdivision (a) was intended to limit the Board's power to deny medical parole. To support his position, he contends the Legislature added the word "reasonably" in response to *Martinez v. Board of Parole Hearings, supra,* 183 Cal.App.4th 578. However, the Attorney General maintains there is no evidence the Legislature included the word "reasonably" in section 3550 in response to any case. Further, the Attorney General points

out that the legislative history is silent as to the purpose of adding "reasonably" to Senate Bill No. 1399.

The Attorney General is correct that section 3550's legislative history contains no mention of *Martinez v. Board of Parole Hearings, supra*, 183 Cal.App.4th 578. In addition, there is no clear explanation in the legislative history regarding the origin of the word "reasonably" in the statute. That said, the Attorney General glosses over several clues that assist us in interpreting the word "reasonably" and understanding why the Legislature included that word in the final version of Senate Bill No. 1399.

As we discuss above, the Legislature crafted Senate Bill No. 1399 to address some of the shortcomings of the medical recall statute. (Analysis of Sen. Bill No. 1399, *supra*, at pp. 3–5.) Under the medical recall statute, if an inmate has the required medical condition, the Board could recommend a recall to the sentencing court if it determined "[t]he conditions under which the prisoner would be released or receive treatment do not pose a threat to public safety." (§ 1170, subd. (e)(2)(B).) In one of the earliest versions of Senate Bill No. 1399, the word "reasonably" does not appear. Instead, the language more closely tracked that of the medical recall statute. Thus, under this earlier version of Senate Bill No. 1399, if an inmate had a qualifying medical condition "and the conditions under which the prisoner would be released would not pose a threat to public safety and, based on the prisoner's condition, does not constitute a threat to public safety, [the inmate] shall be granted medical parole." (Sen. Bill No. 1399 (2009–2010 Reg. Sess.) as amended Apr. 5, 2010, p. 7, italics omitted.)

However, on April 14, 2010, the bill was amended to include the term "reasonably" in qualifying the likelihood of the threat the condition of an inmate's release requires before the Board can deny medical parole. With the change, if an inmate had the required medical condition "and the conditions under which the prisoner would be released would not *reasonably* pose a threat to public safety [the inmate] shall. be granted medical parole." (Sen. Bill No. 1399 (2009–2010 Reg. Sess.) as amended Apr. 14, 2010, italics added.)

Although the legislative history does not explain why "reasonably" was added to Senate Bill No. 1399 on April 14, 2010, the Third District Court of Appeal issued *Martinez v. Board of Parole Hearings, supra*, 183 Cal.App.4th 578 between the April 4, 2010 version of the bill, which did not contain the word "reasonably," and the April 14, 2010 version, which did.

In *Martinez v. Board of Parole Hearings, supra*, 183 Cal.App.4th 578, Martinez challenged the Board's refusal to recommend a recall to the

sentencing court under section 1170. The Third District, applying the highly deferential "some evidence" standard dictated by our Supreme Court in *In re Lawrence* (2008) 44 Cal.4th 1181, 1191 [82 Cal.Rptr.3d 169, 190 P.3d 535] (*Lawrence*) for parole denial cases, concluded the Board did not act "arbitrary [*sic*] or capriciously in impliedly finding that [Martinez] remains an evil, angry, and violent person who could seek the aid of others to threaten public safety." (*Martinez v. Board of Parole Hearings, supra*, 183 Cal.App.4th at p. 595.)

However, the opinion in *Martinez v. Board of Parole Hearings, supra*, 183 Cal.App.4th 578 was not unanimous. In his concurring and dissenting opinion, Justice Sims determined the court applied the wrong test: "The majority say that '[the Board] must deny the request [for recall of sentence] if it finds that the prisoner could be a threat to public safety . . . .' [Citation.] I take this to mean that [the Board] must deny the request if it finds any possibility, no matter how remote, that Martinez would be a threat to public safety if released. [¶] I respectfully disagree with this test. The population eligible for recall of sentence under section 1170 consists of convicted felons who have been sentenced to state prison. Nobody in their right mind would ever find that there is no chance whatsoever that a convicted felon—even a quadriplegic—would commit another crime if released. I think that, by the majority's test, nobody will ever get out of prison. This cannot be what the Legislature intended when it enacted the recall-of-sentence provisions in 1997 to save money." (*Martinez v. Board of Parole Hearings, supra*, 183 Cal.App.4th at p. 599 (conc. & dis. opn. of Sims, J.), italics omitted.)

Justice Sims also offered what he believed to be the appropriate test: "I would adopt a standard for continued incarceration that requires the evidence to show a *reasonable* possibility that a quadriplegic would pose a threat to public safety if released." (*Martinez v. Board of Parole Hearings, supra*, 183 Cal.App.4th at p. 599 (conc. & dis. opn. of Sims, J.), original italics.) Justice Sims concluded, under his standard, the record failed to support Martinez's continued incarceration. (*Ibid.*)

The majority responded to Justice Sims's critique and proposed test: "We decline to read into the statute a test the Legislature could have included but did not. Saying our construction of the statute is flawed because, 'by [that] test, nobody will ever get out of prison' is unwarranted exaggeration. [Citation.] The law presumes [the Board] will properly apply the criteria (Evid. Code, § 664), and its decision is subject to court scrutiny. In any event, if there is a flaw in the statute, it must be fixed by the Legislature not by us. [Citation.]" (*Martinez v. Board of Parole Hearings, supra*, 183 Cal.App.4th at p. 593, fn. 6.)

Thus, the disagreement between the majority and dissent in *Martinez v. Board of Parole Hearings*, 183 Cal.App.4th 578 centered on whether the

Legislature intended the Board to find that the inmate reasonably posed a threat to public safety before it could decline to recommend a recall under section 1170. The majority found no such requirement and determined the Board's conclusion that Martinez's release would pose a threat to public safety was supported by "some evidence."[4]

After the Third District issued *Martinez v. Board of Parole Hearings, supra,* 183 Cal.App.4th 578, the Legislature added the word "reasonably" to Senate Bill No. 1399. "We . . . assume the Legislature had existing laws in mind when it passed the statute, and that it was aware of existing California decisions." (*In re Mark K.* (1984) 159 Cal.App.3d 94, 106 [205 Cal.Rptr. 393]; see *Estate of McDill* (1975) 14 Cal.3d 831, 837–839 [122 Cal.Rptr. 754, 537 P.2d 874].) As the legislative history makes clear, the Legislature proposed Senate Bill No. 1399 to address "some of the issues that have been identified in [section 1170]." (Analysis of Sen. Bill No. 1399, *supra,* at p. 11.) The Third District illuminated another problem with the medical recall statute that could undermine the goal of Senate Bill No. 1399 to release more inmates "who could, by any rational standard, be released without posing a threat to the public" (Analysis of Sen. Bill No. 1399, *supra,* at p. 10) and the Legislature, as urged by the majority, fixed the flaw in the statute by adding the word "reasonably." (See *Martinez v. Board of Parole Hearings, supra,* 183 Cal.App.4th at p. 593, fn. 6.) As such, it defies logic to conclude the Legislature did not add the word "reasonably" to Senate Bill No. 1399 in response to *Martinez v. Board of Parole Hearings, supra,* 183 Cal.App.4th 578.

■ Accordingly, when we consider the text of section 3550, its legislative history, *Martinez v. Board of Parole Hearings, supra,* 183 Cal.App.4th 578, and the timing of the Legislature's addition of the word "reasonably" to Senate Bill No. 1399, we conclude the Legislature intended the Board to be limited to finding an otherwise "permanently medically incapacitated" inmate unsuitable for medical parole only if the evidence shows a reasonable possibility that the conditions of his release would pose a threat to public safety.

---

[4] Although the court found "some evidence" supported the Board's conclusion that Martinez would pose a threat to public safety if released, the court directed the Board to set aside its denial of Martinez's request for a recommendation for recall of his sentence, and to reconsider the matter in compliance with the statutory criteria set forth in section 1170, subdivision (e), and make the findings required by statute. (*Martinez v. Board of Parole Hearings, supra,* 183 Cal.App.4th at p. 597.)

### III

### *THE APPLICATION OF SECTION 3550 TO MARTINEZ*

Here, there is no dispute that Martinez meets the criteria for medical incapacitation under section 3550, subdivision (a). He is a quadriplegic who requires 24-hour care. The issue we therefore must decide is whether the Board correctly found that the conditions under which Martinez would be released reasonably pose a threat to public safety.

### A. Standard of Review

The parties disagree regarding the appropriate standard of review. The Attorney General asserts we should apply the highly deferential "some evidence" standard because the Board is making a parole decision. (See *Lawrence, supra,* 44 Cal.4th at p. 1191; *Martinez v. Board of Parole Hearings, supra,* 183 Cal.App.4th at p. 593.) Martinez insists we need to review the Board's decision de novo.

Generally, we reserve de novo review for pure questions of law. (See *Ghirardo v. Antionioli* (1994) 8 Cal.4th 791, 799 [35 Cal.Rptr.2d 418, 883 P.2d 960].) Such matters include interpretation of statutes (see *People ex rel. Lockyer v. Shamrock Foods Co., supra,* 24 Cal.4th at p. 432), interpretation of contracts except where parties are presenting conflicting extrinsic evidence (see *Parsons v. Bristol Develop. Co.* (1965) 62 Cal.2d 861, 865–866 [44 Cal.Rptr. 767, 402 P.2d 839]), the existence of a duty of care (see *Vasquez v. Residential Investments* (2004) 118 Cal.App.4th 269, 278 [12 Cal.Rptr.3d 846]), and federal preemption (see *Hood v. Santa Barbara Bank & Trust* (2006) 143 Cal.App.4th 526, 535–536 [49 Cal.Rptr.3d 369]). We also independently review the application of law to undisputed facts. (See *Crocker National Bank v. City and County of San Francisco* (1989) 49 Cal.3d 881, 888 [264 Cal.Rptr. 139, 782 P.2d 278]; *Nguyen v. Calhoun* (2003) 105 Cal.App.4th 428, 437 [129 Cal.Rptr.2d 436].) And a grant or denial of summary judgment is subject to de novo review, but we must review the trial court's ruling under the same general principles applicable at the trial level. (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 767 [107 Cal.Rptr.2d 617, 23 P.3d 1143]; *Seo v. All-Makes Overhead Doors* (2002) 97 Cal.App.4th 1193, 1201–1202 [119 Cal.Rptr.2d 160].)

Here, the determination of whether the conditions under which Martinez would be released reasonably pose a threat to public safety is a question of fact. Moreover, the facts are not undisputed and require weighing to make a determination. As such, the Board is in a better situation to weigh the evidence and resolve the factual disputes than the court. An independent

review of the Board's decision therefore is inappropriate. Instead, as the Attorney General suggests, we are inclined to use a "some evidence" standard of review because we are reviewing a parole decision. (See *Lawrence, supra,* 44 Cal.4th at p. 1205.) But in doing so, we believe it important to discuss the differences between medical parole on the one hand, and medical recall and typical parole (parole under § 3000) on the other.

### B. Medical Parole, Medical Recall, and Typical Parole

The Legislature clearly signaled that medical parole is not the same as medical recall. For this reason, we are not persuaded by the Attorney General's contention that we should find the Board's determination sufficient here simply because the Third District already did so in *Martinez v. Board of Parole Hearings, supra,* 183 Cal.App.4th 578. In making this argument, the Attorney General ignores the differences between the medical parole and medical recall statutes, with a critical distinction being that the former requires the Board to determine if the conditions of the inmate's release would reasonably pose a threat to public safety while the latter allows the Board to decline to recommend recall if it believes any threat would exist. (Compare § 3550, subd. (a) with § 1170, subd. (e)(2)(B).) The majority opinion in *Martinez v. Board of Parole Hearings, supra,* 183 Cal.App.4th 578 therefore is of little guidance to us in this matter because the majority clearly rejected the argument that the Board's denial of a recommendation of a recall of Martinez's sentence required it to find a reasonable threat to public safety if Martinez was released. (*Id.* at p. 593, fn. 6.)

Medical parole also presents a stark contrast to a typical parole. In a typical parole hearing, the Board usually considers parole for an inmate who is physically capable of committing the very crimes for which he was sentenced to prison. This is no doubt a complex decision, involving consideration of many variables. Accordingly, this inherently subjective determination (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 655 [128 Cal.Rptr.2d 104, 59 P.3d 174] (*Rosenkrantz*)) is guided by a number of factors, some objective, identified in section 3041 and the Board's regulations (Regs., §§ 2281, 2402). In making the suitability determination in a typical parole hearing, the Board must consider "[a]ll relevant, reliable information," such as the nature of the commitment offense including behavior before, during, and after the crime; the prisoner's social history; mental state; criminal record; attitude towards the crime; and parole plans. (Regs., § 2402, subd. (b).) The circumstances that tend to show unsuitability for parole include that the inmate: (1) committed the offense in a particularly heinous, atrocious, or cruel manner; (2) possesses a previous record of violence; (3) has an unstable social history; (4) has previously sexually assaulted another individual in a sadistic manner; (5) has a

lengthy history of severe mental problems related to the offense; and (6) has engaged in serious misconduct while in prison. (Regs., § 2402, subd. (c).)

For typical parole matters, the regulations also specify circumstances tending to show suitability for parole. These include the inmate: (1) does not possess a record of violent crime committed while a juvenile; (2) has a stable social history; (3) has shown signs of remorse; (4) committed the crime as the result of significant stress in his life, especially if the stress had built over a long period of time; (5) committed the criminal offense as a result of battered woman syndrome; (6) lacks any significant history of violent crime; (7) is of an age that reduces the probability of recidivism; (8) has made realistic plans for release or has developed marketable skills that can be put to use upon release; and (9) has engaged in institutional activities that indicate an enhanced ability to function within the law upon release. (Regs., § 2402, subd. (d).)

These criteria are "general guidelines," illustrative rather than exclusive, and " 'the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the [Board].' " (*Rosenkrantz, supra*, 29 Cal.4th at p. 654; see Regs., § 2402, subds. (c), (d).) Thus, the endeavor is to try "to predict by subjective analysis whether the inmate will be able to live in society without committing additional antisocial acts." (*Rosenkrantz, supra*, at p. 655.)

As the Attorney General correctly points out, we review the Board's denial of typical parole for "some evidence" supporting the Board's conclusion that the inmate remains a current threat to public safety. (*Lawrence, supra*, 44 Cal.4th at p. 1205; *In re Shaputis* (2008) 44 Cal.4th 1241, 1255 [82 Cal.Rptr.3d 213, 190 P.3d 573].) As to this standard, the court in *Lawrence* explained that although it was "unquestionably deferential, [it was] certainly . . . not toothless, and 'due consideration' of the specified factors requires more than rote recitation of the relevant factors with no reasoning establishing a rational nexus between those factors and the necessary basis for the ultimate decision—the determination of current dangerousness." (*Lawrence, supra*, 44 Cal.4th at p. 1210.) In other words, "we independently review the record [citation] to determine 'whether the identified facts [by the Board] are probative to the central issue of current dangerousness when considered in light of the full record before [the Board].' [Citation.]" (*In re Vasquez* (2009) 170 Cal.App.4th 370, 382–383 [87 Cal.Rptr.3d 853].)

A medical parole decision involves a much different calculation than a typical parole case. Unlike typical parole, medical parole is only available to those inmates who are "permanently medically incapacitated" as set forth in

section 3550, subdivision (a) and more explicitly defined in Regulations section 3359.1, subdivision (a)(1). Therefore, an inmate who is eligible for medical parole must have a "medical condition that renders him or her permanently unable to perform activities of basic daily living, and results in the prisoner requiring 24-hour care, and that incapacitation did not exist at the time of sentencing." (§ 3550, subd. (a).) Put another way, an inmate who is "permanently medically incapacitated" would not be physically able to commit a crime similar to the one he committed resulting in his prison sentence. His "permanent medical incapacitation" thus significantly decreases the inmate's threat to public safety. Therefore, the Board can focus on the conditions of the inmate's medical parole (especially where the inmate will be placed for care and treatment) and what means would be necessary for the inmate to reasonably pose a threat to public safety in that environment.

The CDCR's regulations governing medical parole also underscore the differences between typical parole and medical parole. The thrust of the regulations governing medical parole involves the CDCR's determination that an inmate have the required medical condition to qualify for medical parole. To this end, the CDCR prescribes a clear process to be followed before an inmate can be presented to the Board for medical parole consideration.

If an inmate's primary care physician believes an inmate is "permanently medically incapacitated," she refers the inmate for medical parole to the chief medical officer (CMO) or chief medical executive (CME) of the institution where the inmate is housed using CDCR Form No. 7478 (12/10), the medical parole form, along with any other documentation the primary care physician considers useful in determining the inmate's eligibility for medical parole.[5] (Regs., § 3359.2, subd. (a).) The CMO or CME then reviews the medical parole form and any other documentation submitted and makes a determination as to the inmate's eligibility for medical parole based on the inmate's medical case factors as set forth in Regulation section 3359.1, subdivision (a)(1)[6] and (2).[7] (Regs., § 3359.2, subd. (b).) If the CMO or CME concurs with the primary care physician's recommendation, she signs and

---

[5] At this point, the inmate's primary care physician gets the inmate to sign a CDCR Form No. 7385-MP (03/11), the medical parole authorization for release of information. (Regs., § 3359.2, subd. (a).) This form is incorporated by reference into the medical parole form and accompanies the medical parole form throughout the medical parole evaluation process. (Regs., § 3359.2, subd. (a), (g), (h), (i).)

[6] "The inmate is permanently medically incapacitated with a medical condition that renders him or her permanently unable to perform activities of basic daily living and results in the inmate requiring 24-hour care. Activities of basic daily living are breathing, eating, bathing, dressing, transferring, elimination, arm use, or physical ambulation." (Regs., § 3359.1, subd. (a)(1).)

[7] "The medical/physical limitations documented in subsection (a)(1) above did not exist at the time the inmate was sentenced to the current incarceration." (Regs., § 3359.1, subd. (a)(2).)

forwards the medical parole form and any supporting documents to the institution's classification and parole representative (C&PR). (Regs., § 3359.2, subd. (b)(2).) The C&PR then reviews the inmate's central file to determine the inmate's statutory eligibility for medical parole: i.e., the inmate cannot be sentenced to death or life without parole. (Regs., § 3359.1, subd. (a)(3)–(4).) If the inmate is not statutorily disqualified, the C&PR signs the medical parole form, sends the form back to the CMO or CME with additional information,[8] and requests the inmate's caseworker to prepare an evaluation report.[9] (Regs., § 3359.2, subd. (c)(2).)

After reviewing the evaluation report, the C&PR forwards it with any attachments to the warden or chief deputy warden. (Regs., § 3359.2, subd. (e).) The warden or chief deputy warden then reviews, signs, and forwards the evaluation report and attachments to the classification services unit. (Regs., § 3359.2, subd. (f).)

The CMO or CME forwards the medical parole form and attachments to the designated California Correctional Health Care Services office, which identifies suitable placement for the inmate, documents the placement plan information on the medical parole form, and forwards all the documents to the Division of Adult Parole Operations (DAPO) Re-entry Unit. (See Regs., § 3359.2, subd. (g).) The DAPO Re-entry Unit sends the documents to the appropriate parole unit, where the assigned parole agent reviews the recommended placement plan. The parole agent documents her assessment of the placement plan on the medical parole form and forwards a copy to the designated California Prison Health Care Services staff, along with a copy of the CDCR Form No. 1515-MP (02/11), the conditions of medical parole, noting approval or disapproval of the proposed placement and any conditions of medical parole. The assigned parole agent also forwards the original

---

[8] The C&PR provides the following information to the CMO or CME: (1) abstract of judgment for inmate's current commitment offense; (2) probation officer's report for the inmate's current commitment offense; (3) legal status summary; (4) institutional staff recommendation summary; (5) criminal identification and information number issued by the California Department of Justice, Bureau of Criminal Information and Analysis; and (6) the most recent CDC Form No. 128-G (rev. 10/89), classification chrono, with the inmate's full case factors. (Regs., §§ 3359.2, subds. (c)(2), (d)(10)–(15).) This information also is included in the evaluation report prepared by the inmate's caseworker. (Regs., § 3359.2, subd. (d).)

[9] The evaluation report includes (1) the inmate's name and CDCR number; (2) current commitment offense, brief description of the crime, and sentence; (3) county of commitment and county of last legal residence; (4) prior juvenile and adult criminal history; (5) active or potential holds, warrants, and detainers; (6) institutional adjustment including rule violation reports, counseling chronos, pending disciplinary actions, gang/disruptive group information, placement score, current housing assignment, work/education assignments, participation in self-help activities, and other information deemed pertinent to the inmate's case factors; (7) mental health and/or developmental disability status/information; (8) California Static Risk Assessment score; and (9) any victim(s) or next of kin of victim(s) notifications. (Regs., § 3359.2, subd. (d)(1)–(9).)

medical parole form and the conditions of medical parole form to the classification services unit. (Regs., § 3359.2, subd. (h).)

The classification services unit reviews the medical parole form, evaluation report, and conditions of medical parole form for completeness and then forwards all the documents to the Board. (Regs., § 3359.2, subd. (i).)

Against this background, it is clear the focus of the regulations the CDCR promulgated to cover medical parole is on the evaluation of the inmate's medical condition and finding an appropriate placement for the inmate considering his condition. Only after it is determined that the inmate is "permanently medically incapacitated," is not statutorily prohibited from being medically paroled, and a placement plan is selected, does the Board consider whether "the conditions under which the [inmate] would be released would not reasonably pose a threat to public safety." (§ 3550, subd. (a); see Regs., § 3359.1, subd. (d).)

### C. The Board's Decision and "Some Evidence"

The Board found "the condition under which the inmate would be released poses an unreasonable threat to public safety." To support its decision, the Board relied on Martinez's history of disciplinary problems, based largely on misconduct directed toward women, coupled with his commitment offenses (also committed against women) to conclude that Martinez "remains a violent person who is capable of using others to carry out his threats, and that he would also be a public safety threat to those who attend him outside the prison walls." We review the record for "some evidence" supporting the Board's decision that the conditions of Martinez's release would reasonably pose a threat to public safety.

The Board relied on Martinez's commitment offenses to support its denial of medical parole. No doubt Martinez's crimes were abhorrent. He hit two women with his car, grabbed the woman who had slid under his car after being hit, and punched her in the face, breaking her nose. He then placed her in his car and drove her to a secluded area where he proceeded to commit various sexual acts on the injured woman. Martinez richly deserved his conviction and sentence. However, in attacking these poor women, Martinez acted alone. He did not commit the crimes as part of a criminal enterprise or in furtherance of a gang. He is now a quadriplegic. He cannot drive. He cannot move his arms or legs. There exists no chance that he could personally commit his past crimes (or any remotely similar crime) if released.

Further, Martinez's crimes do not fall under any exclusion in section 3550, subdivision (b) because he was neither sentenced to death nor life without the

possibility of parole, and no initiative statute prohibits medical parole for him. Thus, Martinez's crimes do not automatically disqualify him for medical parole.

Martinez's physical condition severely limits his ability to harm others. Indeed, the only way Martinez can harm anyone is if he convinces someone to act on his behalf. Martinez's commitment crimes shed no light on this issue. Martinez had no accomplice. His crimes reveal that Martinez committed gruesome acts and was and still could be an odious and malicious person. However, section 3550 does not prevent medical parole for an inmate simply because the Board deems the inmate loathsome and/or evil.

The Board also relies on Martinez's history of disciplinary problems to support its denial of medical parole. The vast majority of these issues involve Martinez berating prison nurses. Martinez argues that his verbal attacks were in response to the poor care he received. He also claims he suffers from posttraumatic stress disorder, which helped trigger his outbursts. The Board, however, believed Martinez's disciplinary problems stemmed from his anger toward women.[10] We are satisfied that Martinez's behavior problems are "some evidence" that he remains an angry, repulsive person. However, what is less than clear is how these disciplinary problems support the Board's conclusion that the conditions under which Martinez would be released reasonably pose a threat to public safety.

The Attorney General contends the Board's denial is supported by "some evidence" because Martinez's comments show his "willingness to enlist others to help him." Martinez definitely mentions employing the help of others (e.g., he "just ha[s] to get with [his] people" and "when [he] want[s] something done it will be done"), but there is nothing in the record that indicates he was successful in convincing others to do anything but advocate on his behalf through lawsuits and/or complaints to the CDCR. The record does not show that Martinez, while incarcerated, has ever tried to convince another person to hurt any member of the prison staff. Nor is there any evidence in the record that the prison staff felt in danger beyond losing their jobs and/or being sued by Martinez. Martinez's threats may constitute "some evidence" that he would like to take some action against prison staff (although from the record, it is not clear what this action would be beyond suing the individuals and/or getting them fired from their jobs), but they fall

---

[10] Citing *In re Hare* (2010) 189 Cal.App.4th 1278 [118 Cal.Rptr.3d 1] and *In re Ross* (2009) 170 Cal.App.4th 1490 [88 Cal.Rptr.3d 873], the Attorney General asserts Martinez's disciplinary problems indicate "the criminal mentality embodied in the commitment offense has not changed." *Hare* and *Ross* are not instructive here. Neither case involved medical parole or an inmate who would be considered "permanently medically incapacitated" under section 3550, subdivision (a).

short of showing how he would be reasonably capable of getting others to endanger public safety if released.

The Attorney General's argument fails because Martinez needs more than a mere desire to hurt someone before he reasonably poses a risk to the public. He requires the means to accomplish his desire. The means call for Martinez having the opportunity and capability to hurt someone. Thus, "some evidence" must show Martinez's environment, if released, would foster his capability to hurt someone. Put differently, the conditions would somehow make Martinez reasonably capable of convincing someone to act on his behalf to hurt another. The Attorney General, however, argues we must determine "some evidence" supports the Board's decision because Martinez is capable of using others to do his bidding. We disagree.

■ Any inmate who has the ability to communicate possesses the capability to use another to act on his behalf. Thus, unless Martinez was in a coma, there exists the possibility that he could convince someone to do his bidding. The mere existence of this possibility, however, does not create a reasonable threat to public safety. Indeed, even in prison, Martinez currently is capable of using others to harm people. Yet, there is no evidence in the record that he has ever attempted to do so, or if he has, that someone carried out his request. We therefore are not satisfied that the conditions under which Martinez would be released reasonably pose a threat to public safety simply because he "is capable to use others to carry out his threat."[11] Instead, there must be something about the conditions of his medical parole that reasonably gives the Board pause.

If released, Martinez would be placed in Vibra Hospital, an acute care facility.[12] There, he would receive 24-hour care, much like he receives in prison now. We find nothing in the record that could even liberally be construed as "some evidence" that, under these conditions, Martinez reasonably is capable of using others to carry out any desire he might have to hurt another. There is no evidence showing that if placed in an acute care facility, Martinez would be able to convince a staff member to act on his behalf to harm someone (if Martinez so desired). There is nothing in the record indicating the Board could reasonably fear that Martinez's parents, family, or friends would be willing to hurt someone on Martinez's behalf (they have not

---

[11] For this reason as well, we are not persuaded by the Attorney General's inclusion in the return of examples of quadriplegics committing various crimes. These examples show what could be possible, but do not address the critical question here: Under the conditions of his release, would Martinez reasonably be capable of using others to threaten public safety, i.e., harm someone on his behalf. The fact that other quadriplegics have committed crimes under other conditions is not helpful to our analysis.

[12] Martinez's counsel mentioned the possibility of placing Martinez in another facility outside of San Diego County, but very few details were provided.

done so while he has been incarcerated). As Martinez is not a member or associate of any gang or other criminal enterprise, the Board cannot be reasonably worried that gang members or fellow criminals will visit Martinez if released and commit crimes at his urging.

█ Simply put, we find no evidence that could support the Board's belief that Martinez is reasonably capable of using others to carry out his threats if released. This is especially true because the Board can place conditions to further minimize any opportunity Martinez may have to convince another person to harm someone on his behalf. While we agree with the Attorney General that the Board is not mandated under section 3550 to prevent reasonable threats to public safety with parole conditions such that every inmate who is "permanently medically incapacitated" must be released, certainly the Board can and should provide appropriate conditions in a situation, like here, where there is no evidence that Martinez would reasonably pose a threat to public safety if released.

We conclude "some evidence" shows that Martinez committed a heinous crime and he is a scurrilous individual who may harbor a desire to hurt others. We agree, by virtue of his ability to communicate, Martinez is capable of using others to carry out his threats. However, we determine there is no evidence that, under the conditions of his release to an acute care facility, Martinez is reasonably capable of using others to hurt anyone. The threat to public safety if Martinez is released to an acute care facility is nominal and mirrors the level of threat Martinez presents while in prison. The Board's decision therefore cannot stand.[13]

## IV

### MARTINEZ'S REMEDY

Having concluded that "some evidence" does not support the Board's denial of medical parole for Martinez, we must determine the proper remedy for Martinez. Citing *In re Prather* (2010) 50 Cal.4th 238 [112 Cal.Rptr.3d 291, 234 P.3d 541] (*Prather*), the Attorney General maintains that we have to send

---

[13] In reaching our conclusion here, we do not weigh the evidence. We have not considered Martinez's explanation for the disciplinary reports and chronos. In addition, we need not consider the additional information that Martinez has provided in support of his petition and the Attorney General claims was not in front of the Board. If the information was provided to the Board at the hearing and the Board refused to consider it then it might give rise to a challenge that the Board's decision is arbitrary in that the Board failed to consider the proper criteria. (Cf. *In re Shaputis* (2011) 53 Cal.4th 192, 212 [134 Cal.Rptr.3d 86, 265 P.3d 253] (*Shaputis II*).) On the record before us, however, this argument cannot be made nor is it necessary for us to consider in reaching our conclusion.

the case back to the Board for a new medical parole hearing consistent with our findings. Not surprisingly, Martinez insists we should grant medical parole to remain consistent with the Legislature's intent in passing section 3550.

In *Prather, supra*, 50 Cal.4th 238 our high court resolved the issue of the appropriate remedy when a reviewing court concludes a decision by the Board to deny typical parole is not supported by "some evidence." The court concluded "that a decision granting habeas corpus relief in these circumstances generally should direct the Board to conduct a new parole-suitability hearing in accordance with due process of law and consistent with the decision of the court, and should not place improper limitations on the type of evidence the Board is statutorily obligated to consider." (*Id.* at p. 244.) In reaching its conclusion, the court emphasized that the Board had been statutorily granted the exclusive judgment and discretion to make parole suitability decisions and its holding was based on the doctrine of separation of powers. (*Id.* at pp. 250, 256–257.) However, the denial of medical parole was not before the court in *Prather*. Thus, we must determine if the dissimilarity between medical parole and typical parole warrants a different remedy here.

Although we discuss the differences between medical parole and typical parole above, it is important to review those differences in the context of the proper remedy to provide Martinez. Determining if an inmate is suitable for parole under section 3000 requires a significant amount of subjective analysis. (See *Rosenkrantz, supra*, 29 Cal.4th at p. 654.) The Board has the unenviable task of predicting if the inmate is sufficiently prepared to exist outside the confines of prison without reverting to his previous antisocial behavior. In making this determination, the Board is faced with an inmate who committed a crime worthy of incarceration for an extended period of time and has the physical ability to commit additional crimes if released. The Board therefore must consider if "the *prisoner* will pose an unreasonable risk of danger to society if released from prison." (Regs., §§ 2281, subd. (a), 2402, subd. (a), italics added.) Rightfully so, the Board's primary focus is on the prisoner himself: his commitment crime, social history, mental state, attitude toward the crime, parole plans, and insight into the factors that caused him to commit the crime. (Regs., § 2402, subd. (b); *Shaputis II, supra*, 53 Cal.4th at pp. 217–220.)

A different evaluation is involved in determining whether an inmate should be granted medical parole. At the outset, an inmate is only eligible for medical parole because his condition prevents him from performing "activities of basic daily living" and requires the inmate to receive 24-hour care. (§ 3550, subd. (a); Regs., § 3359.1, subd. (a)(1).) As such, the Board must

determine if the "conditions under which the [inmate] would be released would not reasonably pose a threat to public safety." (§ 3550, subd. (a); see Regs., § 3359.1, subd. (d).) The Board's focus for medical parole therefore is on the conditions of the inmate's parole. Of course, any analysis of an inmate's potential dangerousness will involve some consideration of factors and circumstances similar to what the Board evaluates in a typical parole hearing. However, for medical parole, the Board can be less concerned about these factors because the inmate's medical condition significantly reduces the inmate's risk to public safety.

Indeed, unlike at a typical parole hearing, the Board apparently did not deem Martinez's presence at the medical parole hearing important because they did not request his attendance although he was available. Our Supreme Court has noted that the interaction between an inmate and the Board at a typical parole hearing can be critical in the Board's determination whether the inmate poses a risk to public safety if released. (See *Shaputis II, supra*, 53 Cal.4th at p. 212 ["An inmate who refuses to interact with the Board at a parole hearing deprives the Board of a critical means of evaluating the risk to public safety that a grant of parole would entail."].) The Board apparently did not believe its interaction with Martinez was "a critical means of evaluating the risk to public safety" Martinez's release would entail. We do not disagree with the Board's approach because, in the context of a medical parole determination, its focus should be on whether the conditions of the inmate's release reasonably pose a threat to public safety, not on the inmate himself.

Moreover, the Board and the CDCR have much greater control over the conditions for medical parole than they posses in a typical parole. A primary reason the Board's decision in a typical parole matter is so difficult is the Board's lack of control over the environment into which the inmate is to be released. A typical parole requires the Board to predict how a released inmate will act as a member of society without the structure of prison, make an educated guess regarding under what circumstances the inmate may revert to his former criminal ways, and decide if the inmate's parole plans provide an effective approach to avoid those circumstances once released.

In contrast, an inmate released on medical parole will have very little opportunity to resume his past illicit conduct because: (1) his physical condition; and (2) the Board and/or the CDCR can almost completely control the conditions of the inmate's parole. For a quadriplegic inmate like Martinez, he must have 24-hour care. In fact, the conditions of Martinez's release (a patient in an acute care facility) will be similar to his prison existence. Thus, in evaluating the threat of the conditions of an inmate's release for medical parole, the key questions for the Board become: (1) how is the inmate able to threaten public safety and (2) how do the conditions of the inmate's release

facilitate this ability? Underlining these questions is the concept of reasonableness. It is not enough for the Board to be convinced that the conditions of the inmate's release would pose any threat. Instead, the Legislature requires the Board to find the conditions of the inmate's release reasonably pose a threat to public safety before it can deny medical parole. (§ 3550, subd. (a).)

Here, we review how the Board answered the two key questions. The Board determined that Martinez was able to threaten public safety because he "is capable of using others to carry out his threats." This is the *only* way Martinez can pose a threat to public safety. As a quadriplegic, he lacks the ability to physically harm someone by himself. According to the record before us, Martinez's condition is permanent. Thus, the Board's answer to this first question cannot change if we order the Board to reconsider Martinez for medical parole.[14]

The Board did not clearly explain how the conditions of Martinez's release, his placement in an acute care facility, would facilitate his ability to harm others. Instead, the Board implied Martinez's ability to harm would be facilitated because Martinez is a "violent person who is capable of using others to carry out his threats." The Board has identified a possible way in which Martinez can harm another. However, it is not a reasonable possibility. As we conclude above, there is no evidence that Martinez would be reasonably capable of using others to harm people if released to an acute care facility.

What could change about the conditions under which Martinez would be released if we order the Board to reconsider Martinez for medical parole? The Board controls the conditions of Martinez's release. Certainly, the Board would not offer more dangerous conditions than what is before us now if it considered Martinez for medical parole again. Further, unlike in a typical parole matter, there is nothing in the record for the Board to consider that could change the evaluation of the threat Martinez's release would present because the critical evaluation is of the conditions under which Martinez would be released. We are satisfied that the conditions of Martinez's release cannot and would not be made less safe if we asked the Board to reconsider Martinez for medical parole. As such, we struggle to contemplate the point of ordering the Board to consider Martinez again for medical parole.

In reaching this conclusion, we are mindful of our Supreme Court's reliance on the doctrine of separation of powers in *Prather, supra*, 50 Cal.4th

---

[14] If Martinez's medical condition somehow miraculously improves and he no longer requires 24-hour care, he would not be eligible for medical parole. (§ 3550, subd. (a).) If his condition improves to the extent that Martinez no longer requires 24-hour care after being released, the Board must return Martinez to the custody of the CDCR. (§ 3550, subd. (h).)

238. However, as Justice Moreno noted in his concurring opinion: "It is indeed a well-established principle of administrative law that an administrative agency vested with discretion to make a certain decision in the first instance may have its discretion limited on remand or even eliminated entirely by a reviewing court. (See *Tripp v. Swoap* (1976) 17 Cal.3d 671, 677 [131 Cal.Rptr. 789, 552 P.2d 749] [no need to remand on the issue of awarding disability benefits where 'there was no issue remaining on which the trial court could invade the director's discretion'], overruled on other grounds in *Frink v. Prod* (1982) 31 Cal.3d 166, 180 [181 Cal.Rptr. 893, 643 P.2d 476]; *American Federation of Labor v. Unemployment Ins. Appeals Bd.* (1996) 13 Cal.4th 1017 [56 Cal.Rptr.2d 109, 920 P.2d 1314]); *Ross Gen. Hosp., Inc. v. Lackner* (1978) 83 Cal.App.3d 346, 354 [147 Cal.Rptr. 801] ['Where the record of the administrative proceedings requires as a matter of law that a particular determination be made, the court may order that the agency carry out its legal obligation.'].)" (*Prather, supra,* at p. 259 (conc. opn. of Moreno, J.).)

Here, we effectively are preventing the Board's discretion to again deny medical parole for Martinez, but we do so based on the unique facts of this case as well as the clear purpose of section 3550. The two main factors bearing on the reasonableness of the threat caused by Martinez's release are static even if we ask the Board to reassess Martinez for medical parole. Martinez's ability to threaten public safety cannot change. The Board would not make the conditions under which Martinez would be released more dangerous. Accordingly, we see little purpose in the Board reconsidering Martinez for medical parole. Generally, the law does not require an idle act. (See *People v. Coelho* (2001) 89 Cal.App.4th 861, 889 [107 Cal.Rptr.2d 729] ["reviewing courts have consistently declined to remand cases where doing so would be an idle act that exalts form over substance"].) Here, requiring the Board to consider Martinez for medical parole again would be a waste of time and resources. Moreover, our conclusion is consistent with the main legislative goals of section 3550 to save the CDCR money and increase the number of "permanently medically incapacitated" inmates released from prison when their release does not reasonably pose a threat to public safety. We are satisfied that the public is no more threatened with Martinez being released to an acute care facility that will provide him with 24-hour care than it is while Martinez is in prison. And we make our determination per the highly deferential "some evidence" standard. Under these circumstances, separation of powers principles are not offended. (*Prather, supra,* 50 Cal.4th at p. 260 (conc. opn. of Moreno, J.).)

Although we determine that the proper remedy for Martinez is his release on medical parole, we are mindful that the Board is in a better position, and statutorily empowered, to fashion whatever additional conditions it believes necessary for Martinez's medical parole. Therefore, although we grant relief

and reverse the Board's decision, we defer to the Board to set any additional conditions it deems appropriate for Martinez's release. For example, to the extent the Board is concerned with any generalized threats Martinez has made, it can address such concerns with appropriate conditions, including but not limited to, restricting Martinez's unsupervised contact with family and friends.

## DISPOSITION

The Board's decision is reversed. We order the Board to release Steven C. Martinez, under section 3550, subject to whatever conditions it deems appropriate. In the interests of justice, this decision is made final as to this court seven days from the date of filing. (Cal. Rules of Court, rule 8.387(b)(3)(A).)

Nares, J., and Haller, J., concurred.

A petition for a rehearing was denied October 31, 2012.