**RECORD IMPOUNDED**

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-2554-20

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

F.E.D.,

      Defendant-Appellant.

_____

**APPROVED FOR PUBLICATION**

**August 16, 2021**

**APPELLATE DIVISION**

Argued June 9, 2021 – Decided August 16, 2021

Before Judges Ostrer, Accurso, and Enright.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Indictment No. 79-01-1131.

Alison Gifford, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Alison Gifford and Lucy Gray-Stack, Assistant Deputy Public Defender, of counsel and on the briefs).

Frank J. Ducoat, Special Deputy Attorney General/ Acting Assistant Prosecutor, argued the cause for respondent (Theodore N. Stephens II, Acting Essex County Prosecutor, attorney; Frank J. Ducoat, of counsel and on the brief).

The opinion of the court was delivered by

OSTRER, P.J.A.D.

Effective February 1, 2021, the Legislature removed the Parole Board's power to grant "medical parole" to terminally ill or permanently incapacitated inmates, and, instead, empowered the courts to grant such inmates "compassionate release." L. 2020, c. 106, § 1 (codified at N.J.S.A. 30:4-123.51e); see also N.J.S.A. 30:4-123.51c (2001) (repealed by L. 2020, c. 106, § 3) (medical parole). F.E.D., seventy-two and suffering from heart disease, took advantage of the new law; convicted of three murders and serving two life sentences since 1982, F.E.D. petitioned the court for compassionate release.[1]

During the subsequent hearing, he asserted he satisfied the three prerequisites for such discretionary relief: he suffered from a "permanent

---

[1] We use initials because N.J.S.A. 30:4-123.51e(e)(4) declares: "The information contained in the petition and the contents of any comments submitted by a recipient in response thereto shall be confidential and shall not be disclosed to any person who is not authorized to receive or review the information or comments." It is practically impossible to write this opinion without addressing such information. Rule 1:38-1A does permit us to refer to "information in court records even when those records are excluded from public access," but it is unclear if the rule applies to records that statutes, rather than rules, exclude from public access. In any event, a directive requires us to adhere to the statutory provision. See Administrative Directive #04–21, "Criminal — Procedures for Compassionate Release Pursuant to N.J.S.A. 30:4-123.51e," at 2 (Feb. 1, 2021) ("The petition, responses, and information related to the petition . . . shall be confidential pursuant to N.J.S.A. 30:4-123.51e(e)(4)."). We withhold comment on the wisdom of the Legislature's decision to limit public disclosure of prisoners' early release petitions, and on the constitutionality of a statute restricting the content of judicial opinions, see Winberry v. Salisbury, 5 N.J. 240, 255 (1950).

A-2554-20

physical incapacity" (that is, a condition that "did not exist at the time of sentencing," and rendered him "permanently unable to perform activities of basic daily living" and in need of "24-hour care"); he was "physically incapable" of reoffending; and his release "would not pose a threat to public safety." See N.J.S.A. 30:4-123.51e(d), (f), (l). After the hearing, the court denied his petition, finding that he did not satisfy the first and third requirements (without discussing the second requirement).

F.E.D. contends on appeal that the court misinterpreted the statute and found, contrary to the factual record, that he still posed a risk to the public. His arguments are unavailing. To petition for compassionate release, F.E.D. had to present a valid "Certificate of Eligibility for Compassionate Release" from the Department of Corrections, attesting that he suffered from a terminal disease or a permanent physical incapacity. F.E.D.'s certificate was invalid; the medical diagnoses on which the certificate relied did not conclude that F.E.D. was terminally ill or unable to perform activities of basic daily living. Because the court could not even consider F.E.D.'s petition without a valid certificate of eligibility, we do not decide if the court abused its discretion when it found that F.E.D. failed to show, by clear and convincing evidence, that he would not pose a threat to public safety.

# I.

We start by summarizing the compassionate-release statute. Accepting a recommendation of the New Jersey Criminal Sentencing & Disposition Commission, Annual Report: November 2019 30-33 (2019) [hereinafter Sentencing Commission Report], the Legislature empowered courts to grant qualifying inmates "compassionate release" regardless of their parole-eligibility date, see N.J.S.A. 30:4-123.51e(f)(1) (stating that such release is "[n]otwithstanding" N.J.S.A. 30:4-123.53). As the Commission proposed, Sentencing Commission Report at 31, the statute retains the medical-parole statute's criteria for release, but it adopts procedures to hasten decision-making. Compare N.J.S.A. 30:4-123.51c (2001) (repealed by L. 2020, c. 106, § 3) (medical parole) with N.J.S.A. 30:4-123.51e (compassionate release). The Legislature also lifted the medical-parole-law's exclusion of inmates convicted of murder, manslaughter and some other serious crimes. Compare N.J.S.A. 30:4-123.51c (2001) with N.J.S.A. 30:4-123.51e.

Before petitioning the court for release, an inmate must procure a certificate of eligibility from the Corrections Department. "No petition for compassionate release may be submitted to the court unless . . . accompanied by a Certificate of Eligibility for Compassionate Release." N.J.S.A. 30:4-123.51e(f)(2). And the Department must "promptly issue" the certificate if

two department-designated physicians "determine[] that an inmate is suffering from a terminal condition, disease or syndrome, or permanent physical incapacity." N.J.S.A. 30:4-123.51e(b), (d)(2). A "terminal condition, disease or syndrome" means "that an inmate has six months or less to live," and a "permanent physical incapacity" means "that an inmate has a medical condition that renders the inmate permanently unable to perform activities of basic daily living, results in the inmate requiring 24-hour care, and did not exist at the time of sentencing." N.J.S.A. 30:4-123.51e(l).

Armed with the certificate (and the Public Defender's help, if needed, N.J.S.A. 30:4-123.51e(d)(3)), the inmate may petition the court, upon notice to the prosecutor and the inmate's victims. N.J.S.A. 30:4-123.51e(e)(2). The prosecutor and the victims may, within tight timeframes, voice opposition. N.J.S.A. 30:4-123.51e(e)(3) to (7).

Then, the court "may" grant "compassionate release" — but only if the court "finds[,] by clear and convincing evidence[,] that the inmate is so debilitated or incapacitated by the terminal condition, disease or syndrome, or permanent physical incapacity as to be permanently physically incapable of committing a crime if released." N.J.S.A. 30:4-123.51e(f)(1). With inmates who are only physically incapacitated, the court must also find that "the

conditions established" for the inmate's release "would not pose a threat to public safety."[2]  Ibid.

And even if the inmate overcomes all those hurdles, the statute, by stating that "the court may order . . . compassionate release," grants the trial court discretion to deny it.  N.J.S.A. 30:4-123.51e(f)(1) (emphasis added); see Aponte-Correa v. Allstate Ins. Co., 162 N.J. 318, 325 (2000) ("[T]he word 'may' ordinarily is permissive.").

Compassionately released inmates must also obey the usual parole conditions; if they do not, they may be sanctioned.  See N.J.S.A. 30:4-123.51e(a) (stating that compassionately released inmates "shall be subject to custody, supervision, and conditions" under N.J.S.A. 30:4-123.59, and sanctions under N.J.S.A. 30:4-123.60 to 65); and N.J.S.A. 30:4-123.51e(i) (referring to "conditions imposed pursuant to" N.J.S.A. 30:4-123.59).  Also, if the inmate's condition so improves that he or she would not qualify for compassionate release, then the inmate may be returned to custody.  N.J.S.A. 30:4-123.51e(j).

---

[2]  Those conditions appear in "the inmate's release plan," which also addresses the inmate's housing and medical-care needs.  Ibid.; N.J.S.A. 30:4-123.51e(h).

II.

In F.E.D.'s March 17, 2021 petition for compassionate release, he included a certificate of eligibility, signed by the Corrections Department Commissioner, stating that F.E.D. was "eligible and m[et] the requirement for Compassionate Release" because he was "diagnosed with a terminal condition, disease or syndrome, or a permanent physical incapacity" — specifically, "[s]evere dilated cardiomyopathy with unclear etiology; an ejection fraction of 10% - 15%; [and] underlying atrial appendage clot due to atrial fibrillation."

The commissioner signed the certificate following the written recommendation of the department's "Managing Physician/Psychiatrist," Hesham Soliman, M.D.[3] Referring to the "two Physician attestations required under the law," Dr. Soliman said, "I see a medical condition that would be fatal in the near future or [a] permanent physical disability" — not, as the statute requires, a terminal condition resulting in death in "six months or less" or a "permanent physical <u>incapacity</u>" (emphasis added). Although Dr. Soliman wrote that "[F.E.D.] requires home health care" (or, if that was unavailable,

---

[3]  Although the statute contemplates no formal role for the department's medical director in the compassionate-release process, the department has proposed regulations requiring "the health services unit medical director" to "make a medical determination of eligibility or ineligibility" based on two physician's diagnoses "and issue a memo to the Commissioner . . . detailing the same."  53 N.J.R. 675(a) (May 3, 2021) (proposing N.J.A.C. 10A:16-8.6(a)).

nursing-home care), he did not specify that F.E.D. could not perform activities of basic daily living and required twenty-four-hour care.

The two physicians' written diagnoses (or "attestations," per Dr. Soliman), prepared in mid-February 2021, addressed F.E.D.'s "Diagnosis," "Prognosis," "Continued Care Needs," and "Physical/Mental Limitations (if any)."[4] The physicians, Sharmalie Perera, M.D., and Barrington Lynch, M.D., diagnosed F.E.D. with cardiomyopathy with an ejection fraction of ten to fifteen percent; atrial flutter or atrial fibrillation; and heart failure. Dr. Perera also noted that F.E.D. had coronary-artery disease and had received an arterial stent in December 2020, and Dr. Lynch indicated that F.E.D. could improve with "a transitional Automatic Implantable Cardioverter Defibrillator" followed by a heart transplant "as a permanent solution." Both physicians stated that F.E.D.'s prognosis was poor, but neither physician opined about F.E.D.'s life expectancy. Also, neither physician stated that F.E.D. was "permanently unable to perform activities of basic daily living" and required "24-hour care," see N.J.S.A. 30:4-123.51e(l), although they agreed that F.E.D. should wear a "life vest" to prevent "lethal ventricular fibrillation arrest."

---

[4]  These four categories loosely match those dictated by the department's existing medical-parole regulations, N.J.A.C. 10A:71-3.53(e)(1) to (4), and the proposed compassionate-release regulations, 53 N.J.R. 675(a) (May 3, 2021) (proposing N.J.A.C. 10A:16-8.5(a)(1) to (4)).

The physicians also agreed that F.E.D. should continue to live in the infirmary. Dr. Perera said so "due to [F.E.D.'s] diminished physical function"; F.E.D. was "[a]ble to do ADL's [activities of daily living] but [it] takes a long time," and he had to "stop" to "rest after walking [a] short distance due to difficulty breathing." Dr. Lynch said F.E.D. should live in the infirmary "due to diminished ability" — not inability — "in instrumental activities of daily living."[5] Both physicians said F.E.D.'s condition disabled him from working or exercising.

Referring to F.E.D.'s aftercare (his care if released), the physicians said that he would need "significant help" (Dr. Lynch) or "assistance" (Dr. Perera) with laundry, grocery shopping, meal preparation and house cleaning. But, neither physician said that F.E.D. currently needed an aide for basic activities like toileting, bathing, eating, or dressing. Dr. Lynch said that F.E.D. would need a walker only "as his condition deteriorate[s]"; Dr. Perera agreed, saying that F.E.D. "may need [a] walker or [a] wheel chair [sic] when breathing pro[b]lems worsen."

The prosecutor opposed F.E.D.'s petition. At the subsequent plenary hearing, the prosecutor presented no witnesses, but several witnesses testified on F.E.D.'s behalf, and F.E.D. presented numerous letters supporting his

---

[5] The modifier "instrumental" is significant, as we discuss below.

release. F.E.D.'s wife testified about her willingness to house and care for F.E.D., and two former fellow inmates discussed F.E.D.'s rehabilitation and how he helped other inmates' rehabilitation, including their own. F.E.D. himself said he was sorry for his crimes and had become rehabilitated. And, although Dr. Lynch and Dr. Perera did not testify, Dr. Soliman and an outside cardiologist who treated F.E.D., Mark Soffer, M.D., testified about F.E.D.'s serious condition.

Dr. Soffer described F.E.D.'s heart condition, but he declined to assess F.E.D.'s ability to perform activities of daily living. Dr. Soffer explained that in late 2020, F.E.D. suffered from heart failure (measured by a low ejection fraction — that is, "how well the left ventricle . . . the main pumping chamber of the heart, squeezes"). He was short of breath, and his legs were swollen. He also suffered from arrhythmia, which may have added to his problems.

By January 2021, after wearing a life vest (which shocked his heart as needed to treat irregular rhythm) and receiving a stent to treat coronary-artery disease, F.E.D.'s condition had "significantly improved"; "he was breathing much better" and "was minimally short of breath." According to a March 2021 echocardiogram, his ejection fraction had improved from ten-to-fifteen percent to twenty-five-to-thirty percent, but was still under the fifty-five percent norm.

10

But on May 12, 2021, the day before the court hearing, F.E.D. told Dr. Soffer that he became "short of breath" when he lay down in bed, and "very short of breath" when he walked short distances. He also told Dr. Soffer that his life vest shocked him once in February. During that meeting, Dr. Soffer observed that the swelling in F.E.D.'s legs had "almost completely gone"; however, F.E.D. was breathing abnormally fast.

Using a widely accepted statistical model, Dr. Soffer opined that F.E.D.'s one-year and five-year mortality rates were fourteen and fifty-five percent, which would drop to eleven and forty-nine percent if he received an implanted defibrillator. Dr. Soffer diagnosed F.E.D. with "Class 3 Stage C heart failure," meaning he was symptomatic "at . . . low levels of activity or at rest."

Dr. Soliman concluded that F.E.D. satisfied the preconditions for compassionate release. The physician said that F.E.D.'s severe cardiomyopathy made the "likelihood of . . . a terminal condition in the next six months . . . possible." He also noted that F.E.D. remained in the infirmary. Dr. Soliman maintained that, despite the improvement Dr. Soffer had observed, F.E.D. qualified for compassionate release, because his severe cardiomyopathy persisted and his ejection fraction could worsen.

A-2554-20

Regarding activities of daily living, Dr. Soliman testified that F.E.D. "does not ambulate, and his ADL . . . is limited." He ambiguously said that F.E.D. "cannot take care of himself in bathing" and "[o]n a limited basis he can take . . . a little more time to do it." He then noted that, according to Drs. Lynch and Perera, F.E.D. was "very limited in doing his ADLs." Asked if F.E.D. would need "24-hour care," Dr. Soliman said, "He would need some assistance in getting around. . . . I would say that . . . if his staging gets worse, he will need nursing home -- skilled nursing home." But presently, "he may be able to have somebody help him with his ADLs. And that means that somebody would take him to the bathroom, somebody would wheel him around . . . if he was to leave the . . . house."

In summation, F.E.D.'s counsel argued that F.E.D. suffered from a permanent physical incapacity because he had lived in the infirmary for months, could "barely walk," lost "his breath if he walked a few steps," and needed help with laundry, grocery shopping, bathing, and cleaning.[6] And although F.E.D. had improved recently, his condition would persist. Counsel also argued that F.E.D. was "physically incapable of committing a crime" under the statute. According to counsel, F.E.D. satisfied this condition

---

[6] Counsel did not argue that F.E.D suffers from a "terminal condition, disease or syndrome."

because he was unable to commit "crimes that require some level of physicality and that pose a threat to public safety." Lastly, referring to the character witnesses, F.E.D.'s own testimony and institutional record, and F.E.D.'s age, counsel argued that F.E.D. would not pose a threat to public safety if released.

By contrast, the State contended F.E.D. did not suffer a "permanent physical incapacity" as the statute defined it, because the record did not demonstrate he was unable to perform activities of basic daily living. Pointing to F.E.D.'s serious and extensive criminal behavior, the State also argued that he remained a threat to public safety.

In denying F.E.D.'s petition, the trial court found that F.E.D. did not prove by clear and convincing evidence he had a "permanent physical incapacity" under the statute. Noting that the statute did not define "activities of basic daily living," the judge found instructive Medicaid long-term-care requirements, which describe "activities of daily living" as including "bathing, dressing, toileting, locomotion, transfers, eating and mobility." The judge noted that neither Dr. Lynch nor Dr. Perera opined that F.E.D. was "unable to perform . . . activities of basic daily living."

Because F.E.D. did not prove he had a permanent physical incapacity, the court did not decide if such an incapacity made him "permanently

13

physically incapable of committing a crime if released."  But the court did decide F.E.D. had not proved that "the conditions . . . under which [he] would be released would not pose a threat to public safety."  The court considered the reference to a threat to public safety to be categorical.  By contrast, the regular parole statute refers to "a reasonable expectation that [an] inmate will violate conditions of parole," N.J.S.A. 30:4-123.53(a) (emphasis added), and the Criminal Justice Reform Act refers to release conditions that "reasonably assure . . . the protection of the safety of any other person or the community," N.J.S.A. 2A:162-19 (emphasis added).

To guide its decision, the court analyzed several of the factors that guide the Parole Board in deciding whether to grant regular parole.  See N.J.A.C. 10A:71-3.11.  Although "recent positive evidence" corroborated F.E.D.'s rehabilitation, the court ultimately gave greater weight to F.E.D.'s extensive record of criminal behavior — including violent criminal behavior — beginning in his teens; the nature and circumstances of the three homicides for which he was convicted; and F.E.D.'s statement in his pre-sentence report that he might kill again.

This appeal, which we accelerated, followed.

III.

Arguing that the court should have granted him compassionate release, F.E.D. presents three contentions: (1) he suffers from a "permanent physical incapacity" because he requires substantial assistance to perform activities of basic daily living; (2) he would pose no threat to public safety, because he has rehabilitated himself and is in poor health, his age is inversely correlated with recidivism, and he would have a strong support system; and (3) he is permanently physically incapable of reoffending.[7]

A.

We begin with the threshold question: whether F.E.D. suffers from a permanent physical incapacity.[8] Because the statute delegates that question to the Corrections Department in the first instance — by requiring that two designated physicians make that diagnosis, and by requiring the department to issue the essential certificate of eligibility once they do — we conclude that a trial court owes some deference to the agency's determination. Rather than determine anew if an inmate has a permanent physical incapacity, then, a trial

_____

[7] As noted, the trial court did not reach that third issue.

[8] Because F.E.D. does not assert that he has a terminal illness, we consider the issue waived, see Sklodowsky v. Lushis, 417 N.J. Super. 648, 657 (App. Div. 2011), and avoid knotty related issues (such as the percentage required to establish "that an inmate has six months or less to live" when applying models like the one Dr. Soffer used).

court must determine whether the agency's decision conforms with the law, is supported by credible evidence and is not unreasonable — in other words, whether it is arbitrary or capricious. See In re State & Sch. Emps.' Health Benefits Comm'ns' Implementation of Yucht, 233 N.J. 267, 280 (2018) (defining arbitrary and capricious standard).

Notably, the statute does not expressly instruct the court to decide anew if a petitioner meets the permanent-physical-incapacity requirement. Rather, the statute instructs the court to decide — given the inmate's permanent physical incapacity — if the inmate is physically incapable of committing a crime, and if the inmate poses a threat to public safety. For example, the court must decide if the "inmate is so debilitated or incapacitated by the terminal condition, disease or syndrome, or permanent physical incapacity as to be permanently physically incapable of committing a crime if released." N.J.S.A. 30:4A-123.51e(f)(1) (emphasis added). And the court must consider "a threat to public safety" "in the case of a permanent physical incapacity." Ibid. At the same time, the statute does not expressly command a trial court to accept the agency's eligibility determination without scrutiny.

Because the law is unclear, we refer to the legislative history. See State v. Munafo, 222 N.J. 480, 488 (2015) ("If the language is unclear, courts can turn to extrinsic evidence for guidance, including a law's legislative history.").

The bill and committee statements are silent on the question; however, the Sentencing Commission Report provides guidance. See State v. Molchor, 464 N.J. Super. 274, 290 (App. Div. 2020) ("[W]e may look for guidance to the statements of intent that a study commission expressed in recommending [a] statute's enactment"), aff'd sub nom. State v. Lopez-Carrera, 245 N.J. 596 (2021).

The commission stated that "[a]fter a hearing, the court could order the inmate's release upon a finding that . . . [t]he certificate of eligibility was valid and its issuance was proper." Sentencing Commission Report at 31. Therefore, the commission clearly contemplated that courts would review the department's determination, neither deciding eligibility anew nor blindly accepting the agency's decision.

By reviewing the agency's eligibility decision — as opposed to deciding eligibility anew — the court furthers the overarching legislative goal of expediting review of compassionate-release applications. See Sentencing Commission Report at 32 (attributing prior medical-parole law's limited use (in part) to delays in processing applications, and proposing measures to reduce delays); A. L. & Pub. Safety Comm. Statement to A. 2370, at 2 (July 20, 2020) (noting that the bill provides for expedited hearings on compassionate-release petitions). Deciding eligibility anew would fly in the face of this goal by

17

inevitably adding time to the process. Judicial review also increases efficiency by granting primary authority to those physicians best situated to assess the inmate.[9]

Nonetheless, as with judicial review of agency determinations in other contexts, we are "in no way bound by the agency's interpretation of a statute or its determination of a strictly legal issue," Mayflower Sec. Co. v. Bureau of Sec., 64 N.J. 85, 93 (1973), although we afford deference "to the interpretation of the agency charged with applying" a statute, Hargrove v. Sleepy's, LLC, 220 N.J. 289, 301-02 (2015). Nor are we bound by the trial court's statutory interpretation. In re Civil Commitment of W.W., 245 N.J. 438, 448 (2021).

B.

Although the trial judge did not expressly apply this standard of review, he correctly rejected the commissioner's threshold eligibility determination. In reviewing the trial court's determination, we begin by agreeing with the trial court that "activities of basic daily living" involve the rudimentary tasks of "bathing, dressing, toileting, locomotion, transfers, eating and mobility" (as opposed to, for example, shopping, cooking meals, laundering clothes, and house cleaning).

---

[9] We presume that if an inmate requested, but was denied, the requisite physicians' diagnoses or the certificate of eligibility, the inmate could seek our review of that denial as a final agency decision. See R. 2:2-3(a)(2).

A-2554-20

The statute does not define the phrase "activities of basic daily living." Nor did the prior medical-parole statute, N.J.S.A. 30:4-123.51c (2001) (repealed by L. 2020, c. 106, § 3), its implementing regulations, N.J.A.C. 10A:71-3.53, or the department's proposed regulation implementing the compassionate-release statute, 53 N.J.R. 675(a) (May 3, 2021). And the legislative history is as silent as the statute on the term's meaning.

But we deem persuasive the definition California has adopted to implement a strikingly similar statutory scheme for medical parole. California's law provides that an eligible inmate "shall" receive medical parole if (1) the head physician at the inmate's institution determines "that the prisoner is permanently medically incapacitated with a medical condition that renders him or her permanently unable to perform activities of basic daily living, and results in the prisoner requiring 24-hour care, and that incapacitation did not exist at the time of sentencing" and (2) the parole board "determines that the conditions under which he or she would be released would not reasonably pose a threat to public safety." Cal. Penal Code § 3550 (Deering).[10] California's implementing regulations state that "[a]ctivities of

_____

[10] New Jersey's medical-parole law appears to have followed the California model, although the legislative history does not say so expressly. California authorized medical parole for permanently incapacitated inmates in 2010. See 2010 Cal. Stats. ch. 405. New Jersey first authorized medical parole for such

basic daily living are breathing, eating, bathing, dressing, transferring, elimination, arm use, or physical ambulation." Cal. Code Regs. tit. 15, § 3359.1(a)(1)(2021).

We recognize that various other New Jersey laws and regulations define the phrase "activities of daily living"; however, the Legislature chose not to import those definitions into the compassionate-release statute. Such definitions should be considered in the light of the underlying goal of the statutory scheme in which they are found. It is one thing to consider a person's capacity to perform certain activities in defining consumers of "approved adult family care homes,"[11] or in determining if persons may receive insurance

_____

inmates in 2017; until then, medical parole had been limited to terminally ill inmates. See L. 2017, c. 235, § 1; A. L. & Pub. Safety Comm. Statement to A. 1661, at 1 (Feb. 4, 2016). The New Jersey statute, unlike the California one, "maintain[ed] the Parole Board's discretion in determining whether an inmate should be released on medical parole," A. Appropriations Comm. Statement to A. 1661, at 2 (June 20, 2016), and also omits the word "reasonably" in the phrase "would not reasonably pose a threat to public safety." We return to that distinction in our discussion of the trial court's finding regarding the threat to public safety.

[11] See N.J.S.A. 26:2Y-3 (defining "adult family care" as a "24-hour per day living arrangement for persons who . . . need assistance with activities of daily living" and defining "activities of daily living" as "functions and tasks for self-care which are performed either independently or with supervision or assistance, which include, but are not limited to, mobility, transferring, walking, grooming, bathing, dressing and undressing, eating, and toileting").

benefits,[12] enter certain viatical settlements,[13] or receive nursing-facility services.[14] It is another thing to use an inmate's performance of "activities of basic daily living" to assess his or her ability to reoffend or threaten public safety. Nonetheless, these various formulations support the trial court's decision that "activities of basic daily living" include only rudimentary but indispensable tasks like bathing, dressing, toileting, locomotion, transfers, eating and mobility. Including the modifier "basic" before "daily living" also reflects an intention to cover only the most fundamental daily activities —

---

[12] Some individuals may receive family-leave-insurance benefits if they must care for certain family members who are "incapable of self-care." A person is incapable of self-care if he or she cannot independently perform three or more "activities of daily living" or "instrumental activities of daily living," where the former includes "adaptive activities such as caring appropriately for one's grooming and hygiene, bathing, dressing and eating" and the latter includes "cooking, cleaning, shopping, taking public transportation, paying bills, maintaining a residence, using telephones and directories, using a post office, etc." N.J.A.C. 12:15-1.1A. The distinction between "instrumental activities of daily living" and "basic activities of daily living" also appears in other places. See N.J.S.A. 26:2H-5.25 (regarding after-care assistance); Peter F. Edemekong et al., Activities of Daily Living, NCBI (2021) https://www.ncbi.nlm.nih.gov/books/NBK470404.

[13] See N.J.S.A. 17B:30B-2 (defining "[c]hronically ill" persons to include persons "unable to perform at least two activities of daily living, including, but not limited, to eating, toileting, transferring, bathing, dressing or continence").

[14] See N.J.A.C. 8:85-2.1(a)(1) (noting that nursing-facility residents "are dependent in several activities of daily living (bathing, dressing, toilet use, transfer, locomotion, bed mobility, and eating)").

21

certainly not activities like shopping, house cleaning, food preparation and laundry.

F.E.D. contends that a person who can perform an activity of basic daily living only with another's help is "unable to perform" it. That may be so, but we disagree with his contention that requiring assistance with "several" or "nearly all" "activities of basic daily living" satisfies the statute. That would be a vague standard indeed, one we doubt the Legislature intended. And if a person who cannot perform some "activities of basic daily living" satisfies the statute, does it matter which activities those are?

F.E.D. argues that some is enough, because the Medicaid program authorizes nursing-home care for persons who need "hands on assistance with three or more activities of daily living,"[15] and the compassionate-release statute is linked to Medicaid — that is, it requires that inmates receive help applying "for medical assistance benefits under the Medicaid program." N.J.S.A. 30:4-123.51e(h)(3). But the statute's bare reference to help applying for Medicaid is too weak a signal that the Legislature intended to import Medicaid's long-term-care standard of needing help with three activities of

---

[15] For this information, F.E.D. quotes Medicaid Managed Long Term Servs. & Supports, State of N.J., Dep't of Hum. Servs., Div. of Med. Assistance & Health Servs., https://www.nj.gov/humanservices/dmahs/home/mltss.html (last visited July 29, 2021).

daily living. If the Legislature intended to refer to less than all activities, it could have done so. Cf. N.J.S.A. 17:30B-2 (setting the number at two); N.J.A.C. 12:15-1.1A (setting the number at three). By stating that a person is "unable to perform activities of basic daily living," the Legislature meant "unable to perform any activity of basic daily living."

We also reject F.E.D.'s contention that "legislative history," in the form of sponsors' post-enactment press statement, supports his interpretation.[16] True, two of the statute's sponsors acknowledged that the medical-parole system resulted in the release of few "gravely ill inmates" and that the new legislation was intended to "show true compassion to those with profound medical needs." Press Release, Governor Murphy Signs Sentencing Reform Legislation (Oct. 19, 2020), https://www.nj.gov/governor/news/news/562020/ 20201019d.shtml (joint statement of Assemblyman Gary Schaer and Assemblywoman Verlina Reynolds-Jackson). Yet, the Sentencing

---

[16] A sponsor's post-enactment statement is a shaky foundation on which to rest a statutory interpretation. By that time, the legislator's job is complete and the opportunity for fellow legislators to respond has passed. See State v. Bey (I), 112 N.J. 45, 98 (1988) ("[P]ost-enactment . . . statements should not normally inform the construction and application of a precedent statute"); N.J. Coal. of Health Care Pros., Inc. v. N.J. Dep't of Banking & Ins., 323 N.J. Super. 207, 255-56 (App. Div. 1999). By contrast, a Governor's signing statement carries weight because a Governor, in issuing it, exercises his or her role in the legislative process. See Perez v. Rent-A-Center, Inc., 186 N.J. 188, 215 (2006) (considering Governor's signing statement in determining legislative intent).

A-2554-20

Commission proposed to increase the number of releasees not by relaxing the medical-parole standards, but by streamlining procedure and tightening timeframes. Sentencing Commission Report at 31-32 (discussing medical-parole standards, proposing that Legislature "establish similar standards" for compassionate release, and noting that "one significant reason" medical parole was "rarely used" was because of procedural delays). The Legislature based the statute on the commission's recommendations, S. Judiciary Comm. Statement to First Reprint of A. 2370, at 1 (Aug. 24, 2020); it also expanded the pool of potential beneficiaries by making convicted murderers and kidnappers, among others, eligible, cf. N.J.S.A. 30:4-123.51c(a)(3) (2001) (repealed by L. 2020, c. 106, § 3) (excluding certain offenders from medical parole).[17]

## C.

Applying this understanding of the statute and the court's role, we affirm the court's denial of F.E.D.'s petition. We do so because the commissioner's certificate of eligibility was invalid. It did not conform to the law's requirement that two physicians diagnose F.E.D. with a "permanent physical

---

[17] The Commission and the Legislature intended to reduce the Corrections Department's costs of caring for terminally ill and permanently incapacitated inmates. Sentencing Commission Report at 33. However, a fiscal estimate predicted, at best, modest savings. A. Appropriations Comm. Statement to A. 2370, at 6 (July 27, 2020).

incapacity as defined." <u>See</u> N.J.S.A. 30:4-123.51e(b), (d)(2).  Specifically, the diagnoses did not determine that F.E.D. was "permanently unable to perform activities of basic daily living."  <u>See</u> N.J.S.A. 30:4-123.51e(l).

Rather than find F.E.D. unable to perform activities of daily living, Dr. Perera affirmatively found that he could "do ADL's," although they "take[] a long time."[18]  Dr. Lynch did not expressly address "activities of basic daily living," but he noted that F.E.D. should be housed in the infirmary "due to diminished ability in <u>instrumental</u> activities of daily living" (emphasis added).  As we have noted, "instrumental activities of daily living" are distinct from "basic activities of daily living" and include tasks like shopping, cooking and cleaning.

And Dr. Lynch's statement that F.E.D. would need a "[w]heeled [w]alker for **fall** prevention as his condition deteriorate[s]" indicated that F.E.D. was currently capable of ambulating (a basic activity of daily living) without one.

---

[18]  We acknowledge that some may argue that if it takes a person too long to perform a task — like donning socks and shoes, or managing a fork or spoon — one might say (although the two physicians did not) that the person was "unable to perform" the task under the statute.  Measuring the ability to perform activities of daily living is, evidently, a specialized task of occupational therapists.  <u>See</u> Mary Law & Lori Letts, <u>A Critical Review of Scales of Activities of Daily Living</u>, 43 Am. J. Occupational Therapy 522, 522 (Aug. 1989).  But the record does not address nuances in how to assess and measure a person's ability to perform activities of daily living — particularly when the goal is not to assess needs for occupational therapy or care, but to assess the person's ability to commit crimes.

That statement was consistent with Dr. Perera's finding that F.E.D. "may need [a] walker or wheel chair [sic] when breathing pro[b]lems worsen." In short, the two physicians did not make the predicate findings for issuing the certificate of eligibility.

Dr. Soliman's testimony is no substitute for the physicians' diagnoses. The statute requires the department to issue a certificate of eligibility based on the two physicians' assessment. Although the statute does not preclude the medical director from reviewing the diagnoses and conveying them to the commissioner, the medical director is not the best witness to convey those diagnoses to the court.[19]

In sum, the certificate of eligibility was invalid because the physicians did not find that F.E.D. was "unable to perform activities of basic daily living." Without a valid certificate, the court lacked authority to consider release. N.J.S.A. 30:4-123.51e(f)(2). Therefore, the court correctly denied F.E.D.'s petition.[20]

---

[19] Conceivably, the medical director's testimony may bear on other aspects of the statute. We shall not try to define the appropriate scope of such testimony here.

[20] The court did not address the other findings needed to conclude that a person has a "permanent physical incapacity": that the person requires "24-hour care" and that the condition did not exist at the time of sentencing. N.J.S.A. 30:4-123.51e(l). Therefore, we do not decide if Dr. Perera's

D.

Pressing beyond its non-eligibility finding, the trial court also rejected F.E.D.'s claim that his release conditions would not threaten public safety. We need not say if the court was correct on that issue; F.E.D.'s petition was not properly before the court in the first place. However, without mapping all of the statute's uncharted territory, we offer these limited observations.

Were we to review the trial court's public-safety decision, we would review it for an abuse of discretion. Like parole decisions, the court's decision to grant or deny compassionate release depends on "inherently imprecise" appraisals. See Acoli v. N.J. State Parole Bd., 224 N.J. 213, 222 (2016). The predictive nature of the court's decision-making is also akin to pre-trial detention decisions, where a court must decide whether conditions could control the risk that a released arrestee would threaten safety, obstruct justice,

_____

statement that F.E.D. needed to be in the infirmary "due to diminished physical function" was equivalent to saying he needed "24-hour care," especially if life on a prison block requires "physical function" unlike life in other residential settings. Nor do we decide if Dr. Lynch addressed the twenty-four-hour-care requirement by stating that F.E.D. needed "[c]ontinued [h]ousing in the [i]nfirmary [u]nit," especially since Lynch's recommendation was due to F.E.D.'s "diminished ability in instrumental activities of daily living." As to whether the condition existed at the time of sentencing, the physicians ought to have addressed the issue, but did not. However, no one disputes that F.E.D.'s heart condition arose years after his sentencing as a thirty-three-year-old man.

or not appear — decisions we review for an abuse of discretion. State v. S.N., 231 N.J. 497, 515 (2018).

The statute, as noted, already specifies that a physically incapacitated inmate be physically incapable of committing a crime; the no-threat-to-public-safety requirement is an additional prerequisite that applies to physically incapacitated, but not terminally ill, inmates. Assuming that the no-threat-to-public-safety requirement is not mere surplusage, see Feuer v. Merck & Co., 455 N.J. Super. 69, 79 n.2 (App. Div. 2018), aff'd o.b., 238 N.J. 27 (2019), the statute contemplates that a person who is "physically incapable" of committing a crime may still pose a threat to public safety. How that is so, is not so clear. F.E.D. contends that, to avoid "preclud[ing] [all] inmate[s] from being released," the "physical[] incapab[ility]" standard should be read to encompass only crimes "requiring some level of physicality," and to exclude crimes like "downloading child pornography or mailing a bad check."[21] That, of course, would leave petitions by inmates who committed those latter two crimes as grist for the threat-to-public-safety mill. But it would also narrowly — perhaps too narrowly — construe the only test that applies to terminally ill inmates.

---

[21] It is unclear how this test would help F.E.D. If he is physically capable of eating with a knife or fork, he (presumably) is physically capable of criminally assaulting someone with it.

We are not convinced that the Legislature intended "physical[] incapab[ility]" to be so limited. First, the plain language of the statute does not support such a limitation. Second, the statute's legislative history reflects an intention to create a strict standard. The 1996 study commission that recommended the original medical-parole law, L. 1997, c. 214, contemplated parole for inmates who could "not physically pose a threat of committing another crime if released." Study Comm'n on Parole, Report of the Study Commission on Parole (1996) at 22-24 (emphasis removed). But the Legislature evidently went farther in requiring that inmates be "permanently physically incapable of committing a crime." A. L. & Pub. Safety Comm. Statement to A. Comm. Substitute for A. 22, at 1 (March 3, 1997).

Perhaps "physically incapable" refers to an inmate's personal, unassisted physical capacity to commit a crime. If so, persons who suffer from severe dementia or paralysis or otherwise lack control of muscular or neurological function may be "physically incapable" of using a computer or writing a bad check (as well as firing a weapon or stealing a car).[22] However, a person with quadriplegia, if communicative (though that requires some physicality, too),

---

[22] We acknowledge that this is a narrow group. One study contends that the "permanently medically incapacitated" standard is "unduly, and even cruelly, restrictive," and advocates for alternative criteria. Mary Price, Everywhere and Nowhere – Compassionate Release in the States 13, 16-20 (2018). However, it is not our role to alter the standard the Legislature has adopted.

could enlist another to commit a crime on his or her behalf. In such a case, the "threat of public safety" test may prove its worth. See In re Martinez, 148 Cal. Rptr. 3d 657, 675, 679 (Ct. App. 2012) (concluding that a quadriplegic inmate did not "reasonably pose a threat to public safety" and ordering parole board to release him on medical parole).

In any case, here, the trial court construed the "threat to public safety" strictly, noting that the statute omits the word "reasonable" — unlike the parole law, which refers to "a reasonable expectation" someone will violate parole, N.J.S.A. 30:4-123.53(a), or the Criminal Justice Reform Act, which refers to release conditions that "reasonably assure" public safety, N.J.S.A. 2A:162-19.

The California Court of Appeal, in construing its state's medical-parole law for physically incapacitated inmates, attached great importance to the presence of the word "reasonably." In re Martinez, 148 Cal. Rptr. 3d at 664-668. Unlike the New Jersey statute, the California law allows medical parole if the inmate does not "reasonably pose a threat to public safety." Cal. Penal Code § 3550 (Deering) (emphasis added). The Court of Appeal distinguished the medical-parole law from a law that did not use "reasonably" and that permitted resentencing of physically incapacitated inmates only if they posed no threat to public safety. In re Martinez, 148 Cal. Rptr. 3d at 664-668. The

A-2554-20

court held that the quadriplegic medical-parole candidate did not <u>reasonably</u> pose a threat to public safety. He was unlikely to enlist others to commit crimes on his behalf, notwithstanding the parole board's fears that he would. So, the court held that he was entitled to medical parole. <u>Id.</u> at 673, 675, 679. <u>See also</u> Sarah L. Cooper & Cory Bernard, <u>Medical Parole-Related Petitions in U.S. Courts: Support for Reforming Compassionate Release</u>, 54 Creighton L. Rev. 173, 185-86 (2021) (reviewing <u>Martinez</u> and suggesting "that the assessment of a prisoner's risk to public safety should be nuanced and evidence-informed, reflecting that ill health likely lessens that risk").

These are knotty issues, to be sure. We defer deciding how much "physicality" is required to be "physically incapable of committing a crime," and how much "threat to public safety" is enough to bar compassionate release, to a case requiring those decisions.

E.

In sum, we affirm the trial court's order denying F.E.D.'s compassionate release. Although F.E.D.'s rehabilitation efforts are laudable and his medical condition serious, our role is to interpret the statute; we must affirm the decision below because the certificate of eligibility, which depended on medical diagnoses lacking essential findings, was invalid.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2554-20