Filed 5/28/26

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br>v.<br><br>JAMES BRINSTON,<br><br>        Defendant and Appellant. | A173470<br><br>(Sonoma County<br>Super. Ct. No. SCR-24193-1) |

James Brinston appeals from the trial court's denial of his request for compassionate release under Penal Code section 1172.2.[1]  The trial court found that although Brinston was medically incapacitated and therefore presumptively entitled to compassionate release, the presumption was overcome by its finding that Brinston was an unreasonable risk of danger to public safety.  The trial court relied on information from Brinston's parole hearing three years earlier, when the Board of Parole Hearings (BPH) found Brinston had no understanding of his own criminal behavior and scored highly on certain risk assessments despite having some physical limitations.  The trial court failed to recognize, however, that Brinston's physical condition had changed significantly and materially in the three years following the denial of parole.  By the time of the section

---

[1] Undesignated statutory citations are to the Penal Code.

1

1172.2 hearing, Brinston lacked any residual lower extremity function, was belted into a customized wheelchair to keep him from falling out, displayed progressive intention tremor, was unable to raise his shoulders, and suffered from fecal incontinence and constant urinary incontinence that was causing chronic infection of his thighs and buttocks. Brinston was also diagnosed with ankylosing spondylitis, a progressing and permanent condition that left him as stiff as a mannequin, prevented him from rotating his head, and made it difficult for his caretakers to perform basic hygiene for him.

Brinston's physical condition forecloses any realistic possibility of Brinston harming others, even if he were still predisposed to do so as the trial court found. We therefore conclude that the trial court's denial of Brinston's request for compassion release was an abuse of discretion and must be reversed.

## BACKGROUND

In 1996, Brinston was 38 years old and went on two dates with a 20-year-old woman.[2] A few days later, Brinston helped

---

[2] Many of the facts we recite are contained in the probation report and other documents placed in the confidential clerk's transcript. Brinston himself cites and relies on these confidential materials without seeking to file his brief under seal, which we treat as a waiver of the confidentiality. (*People v. Coddington* (2000) 23 Cal.4th 529, 617, fn. 38, overruled on other grounds by *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1060 & fn. 13 & superseded by statute on other grounds as stated in *People v. Zamudio* (2008) 43 Cal.4th 327, 355–356; see Cal. Rules of Court, rule 8.47(c)(2) [to maintain confidentiality parties can move to file a document under seal].)

the woman move to a new home. She told Brinston she wanted to end the relationship. Brinston surreptitiously took a knife from the kitchen and called her to the bathroom, complaining that there was no soap. When she came to help him, he threatened her with the knife and struggled with her when she tried to run away. They wound up in the bedroom, where, pointing the knife toward the victim, Brinston held her down while he orally copulated her, placed his fingers in her vagina, and raped her. The victim placed a monitored call to Brinston from the police department. Brinston admitted he had made a mistake, said they could work it out and he would go to counseling with her, and asked her not to report the rape.

Brinston pleaded guilty to oral copulation with force, foreign penetration with force, and forcible rape, and admitting using a knife in the commission of the rape. The probation officer's presentence report summary of Brinston's criminal history stated that he had committed theft or unlawful driving of a vehicle numerous times between the ages of 18 and 28. In March 1991, Brinston had been convicted of two counts of unlawful sexual intercourse with a minor, two counts of lewd or lascivious acts with a child 14 or 15 years old, and admitted three prior prison term enhancements. The two counts of lewd or lascivious acts with a child 14 or 15 years old involved an incident in which he asked a 15-year-old girl to get into his vehicle to talk, forcibly kissed her, and tried to rip off her clothing. Brinston's sentence for his March 1991 conviction was seven years and four months in prison. He was on parole from

3

that sentence when he committed his offenses in 1996. In March 1997, the trial court sentenced him to 15 years to life in prison on the rape count, with concurrent six-year terms on the remaining counts.

In March 2025, the California Department of Corrections and Rehabilitation's (CDCR) director of health care services sent the trial court a letter stating it had determined that Brinston was permanently medically incapacitated and unable to independently complete basic activities of daily living. According to a physician's report included with the CDCR's notice, Brinston had been diagnosed with ankylosing spondylitis, cerebrovascular disease with a history of recurrent strokes, progressive intention tremor, hyperlipidemia, hypertension, insulin-dependent type 2 diabetes mellitus, osteoporosis, and ulcerative colitis. Due to multiple strokes since 2000, Brinston had developed right-sided weakness and needed a lap belt to prevent him from falling while seated in his wheelchair. His physical therapist reported that he was not making any progress and was unable to lift his shoulders above his head.

Brinston's ulcerative colitis led to his ankylosing spondylitis. Ankylosing spondylitis is a type of chronic arthritis that affects the spine and sacroiliac joints where the spine meets the pelvis. Over time, it results in inflammation, pain, and stiffness. In severe cases, the vertebrae of the spine fuse, resulting in reduced flexibility and a hunched posture.

Brinston's ankylosing spondylitis was severe. It caused Brinston to have diffusely debilitating stiffened joints. He lost all

4

strength in his lower extremities, which were contracted and stiff. His entire axial skeleton had fused to a profoundly rigid state, "like a 'bamboo stick.'" Brinston looked "'as stiff as a mannequin'" in his customized wheelchair and could not rotate his neck. His overall rigidity made it hard for staff to perform his basic hygiene. However, he could feed himself with both hands if someone set up food for him. He could no longer transfer to a shower chair, so he received only bed baths. The doctor's report further stated, "After 2023, caregivers report [Brinston] has had increasing difficulty with all [activities of daily living] secondary to progressive ankylosing spondylitis rigidity."

Brinston was at very high risk for skin breakdown and infections at his bony prominences because he could no longer shift his weight or bend major joints. He was incontinent of bowel and bladder. Despite frequent diaper changes, his urinary incontinence led to chronic infection of his buttocks and he needed routine wound care for skin maceration on his thighs.

Caregivers reported neurocognitive decline after Brinston's recurrent strokes, including forgetfulness and likely expressive aphasia.[3] His stiffened shoulders prevent him from writing. A brain MRI showed signs of vascular dementia and was

_____

[3] Expressive aphasia is an impairment of the ability to produce language. (See *Alonzo v. Comm'r of Soc. Sec.* (N.D.Cal. July 24, 2020, No. 19-cv-01916-RMI) 2020 U.S.Dist.LEXIS 131629, at *3; Bender, Attorneys' Dict. of Medicine (2025) ["expressive aphasia" & "aphasia, motor"].)

remarkable for bilateral cerebellar chronic infarcts with extensive microvascular ischemic disease.[4]

The physician's report stated that if Brinston's sentence were recalled, he would be released to an appropriate facility to fulfill his needs. Before discharging him, staff would ensure that he had applied for Medi-Cal and, if indicated, arrange for in-home hospice support services.

The CDCR's notice also included the probation officer's presentence report from Brinston's most recent offense, a diagnostic study report, and the transcript of a July 2022 BPH decision denying him parole for three years. The diagnostic study report said that Brinston's security level score was 19 points, the mandatory minimum score for someone with his offenses and life sentence. (See Cal. Dept. of Corrections & Rehabilitation, Operations Manual (2025) ch. 6, art. 1, § 61010.11.5(b), <https://www.cdcr.ca.gov/operations-manual/dom/> as of May 18, 2026.) This placed him in level II, the second lowest level out of four levels. (Cal. Code Regs., tit. 15, § 3375.1(a)).) Brinston's disciplinary history showed six instances of being disrespectful to staff between 2004 and 2019 and one instance of being out of bounds in 2015. Brinston had three serious rules violations, resisting a peace officer in 2010 and 2011 and disrespect with potential for violence or disruption in 2015.

---

[4] Vascular dementia is memory loss and mental deterioration due to multiple small strokes or impaired blood flow to the brain. (Bender, Attorneys' Dict. of Medicine (2025) ["vascular dementia"].)

6

When it denied him parole in 2022, the BPH made numerous observations about Brinston's risk profile, criminal offense history, and mental and physical state. Brinston had an elevated risk of sexual offending under the Static-99, although the BPH did not note his score. A clinician found that he had a moderate risk of future violence, which meant that he posed a somewhat elevated risk relative to other long-term offenders. But for Brinston's health and physical ailments, the clinician would have considered him a high risk for violence. The BPH described Brinston's physical limitations as being in a wheelchair, having had a stroke, and having tremors. It speculated that Brinston might have language or cognitive functioning issues but did not identify anything specific. His criminal and parole history showed that his crimes escalated in seriousness, he performed poorly on supervised release and parole, and he was on parole at the time of his last crime. He was impulsive at the time of his crime, was dishonest with his victim, and tried to manipulate her to not turn him in or testify.

The BPH's main concern was that Brinston had not changed. He had taken some programs to address his risk factors, but his understanding of those programs and his triggers or risk factors was non-existent. He had not taken any courses or self-study on sexual offending and did not understand why he had committed his offense. He had little understanding of the impact of his crimes on his victims. He justified his actions, which led him to victimize and manipulate others, and he could still do that. Brinston had told the BPH he wanted to teach

others about rape and help them solve their problems. The BPH found this mentality was not very realistic because he had not even faced his own problems or understood the harm he had caused his victims. His disciplinary history in prison, although the BPH gave it little weight, suggested he was still able to react in angry and confrontational ways. The BPH set Brinston's next parole hearing in three years' time.

After the CDCR sent the trial court the notice that he met the criteria for compassionate release under section 1172.2, Brinston filed a request for release. The People did not file anything in response. At the hearing, the People did not dispute that Brinston was medically incapacitated. But the People argued that there was clear and convincing evidence that Brinston was an unreasonable risk to public safety. The People asserted that the victim had said in phone conservations and in a letter in a prior parole hearing that she had fear and concerns about Brinston's release and was worried about being stalked by family and friends trying to dissuade her from testifying or reporting the crime, but the People did not introduce anything into evidence to support these assertions.

The trial court denied Brinston's request. Like the People, it did not dispute that Brinston was medically incapacitated. It acknowledged this led to a presumption in favor of recalling Brinston's sentence under section 1172.7. But it found that presumption was overcome by clear and convincing evidence that Brinston still posed a significant risk to the community.

The trial court said the packet of information attached to the CDCR's notice did not include a post-release plan for Brinston. The court found the packet established that the CDCR's medical director believed Brinston was incapacitated but did not address any current or future threat and was silent about his state of mind, thought process, or sexual deviancy. The court therefore looked to the BPH ruling as the only place for information about Brinston's state of mind and risk of future harm.

The trial court stated that many of Brinston's medical conditions listed in the current diagnosis were ongoing at the time of the BPH hearing in 2022, including that he was wheelchair bound, post stroke, not fully able to use all his extremities or care for himself, and had concurring ailments. The trial court recited the BPH's observations about Brinston's elevated risk of sexual re-offense under the Static-99, moderate risk of future violence that would have been higher but for his physical limitations, lack of understanding of his own triggers or risk factors, lack of courses or self-study about sexual offenses, and lack of insight into the impact of his crime on the victim. The trial court said the BPH found Brinston continued to present manipulative thinking. The trial court predicted that Brinston's high risk of sexual violence, traces of manipulativeness, and physical conditions, when combined, might put him in a position to manipulate others into assisting him because of his needs, which could increase the risk of harm to those he could get to assist him. The trial court suggested the BPH had received much

9

more information than was available in the CDCR records and described the BPH's findings as close in time and at a point when Brinston was similarly situated to his current medical condition. The trial court then concluded that Brinston posed a significant risk to the community if he were released.

## DISCUSSION

### I. Legal Background and Standard of Review

"California law authorizes the compassionate release of prisoners through section 1172.2." (*In re Brissette* (2025) 112 Cal.App.5th 147, 161.) Section 1172.2 mandates that if, after any necessary consultation with other clinical executives, the CDCR's statewide chief medical executive determines that an incarcerated person satisfies either of two medical criteria set forth in section 1172.2, subdivision (b) (section 1172.2(b)), the CDCR "shall recommend to the court that the incarcerated person's sentence be recalled." (§ 1172.2, subd. (a).) The first criterion supporting compassionate release is if "[t]he incarcerated person has a serious and advanced illness with an end-of-life trajectory." (§ 1172.2(b)(1).) The second is if "[t]he incarcerated person is permanently medically incapacitated with a medical condition or functional impairment that renders them permanently unable to complete basic activities of daily living, including, but not limited to, bathing, eating, dressing, toileting, transferring, and ambulation, or has progressive end-stage dementia and that incapacitation did not exist at the time of the original sentencing." (§ 1172.2(b)(2).) "Any recommendation for recall submitted to the court by the department shall include one

10

or more medical evaluations, a postrelease plan, and findings pursuant to" section 1172.2(b). (§ 1172.2, subd. (h).)

If the trial court finds that an incarcerated person meets the criteria in section 1172.2(b)(1) or (2), "[t]here shall be a presumption favoring recall and resentencing . . . which may only be overcome if a court finds the defendant is an unreasonable risk of danger to public safety, as defined in subdivision (c) of Section 1170.18, based on the incarcerated person's current physical and mental condition." (§ 1172.2(b).) Section 1170.18, subdivision (c) in turn defines an unreasonable risk of danger to public safety as "an unreasonable risk that the incarcerated person will commit a new 'super strike,' which is any violent felony listed under section 667, subdivision (e)(2)(C)(iv)." (*In re Brissette, supra*, 112 Cal.App.5th at p. 162.) Such violent felonies include offenses such as oral copulation with force, foreign penetration with force, forcible rape, and kidnapping or assault with the intent to commit such crimes; sexual acts with children under 14 years of age; any homicide or attempted homicide offense; and solicitation to commit murder. (Pen. Code, § 667, subd. (e)(2)(C)(iv)(I)–(V); Welf. & Inst. Code, § 6600, subd. (b) [incorporated by reference into Pen. Code, § 667(e)(2)(C)(iv)(I)].)

"If the court grants the recall and resentencing application, the incarcerated person shall be released by the department within 48 hours of receipt of the court's order, unless a longer time period is agreed to by the incarcerated person." (§ 1172.2(*l*).)

"Section 1172.2 became effective on January 1, 2023, and amended the existing procedures for compassionate release [in

11

former section 1170, subdivision (e) (former section 1170(e))].
[Citation.] The Legislature intended for section 1172.2 to
'broaden the eligibility criteria for compassionate release and
make it available to more incarcerated persons.' [Citation.]
Section 1172.2 was also intended to save California taxpayers the
high costs of health care for terminally ill or aging inmates and to
streamline the cumbersome process for obtaining compassionate
release. [Citations.] According to the author of section 1172.2
(whose comments were part of the legislative record and
analyses) many inmates who did not pose a risk to public safety
would die in prison while awaiting a referral for compassionate
release, which in part resulted in California bearing the health
care expenses of those inmates." (*In re Brissette, supra*, 112
Cal.App.5th at pp. 164–165.)

On appeal, "[w]e review for abuse of discretion the trial
court's determination that a petitioner poses an unreasonable
risk of danger to public safety. [Citation.] 'A trial court abuses
its discretion when the factual findings critical to its decision find
no support in the evidence.' [Citation.] We review the trial
court's factual findings for substantial evidence." (*People v. Lewis*
(2024) 101 Cal.App.5th 401, 409.) "We review questions of
statutory interpretation de novo." (*People v. Multani* (2024) 106
Cal.App.5th 1334, 1343.) Under the abuse of discretion standard,
a trial court's " ' " 'decision will not be reversed merely because
reasonable people might disagree. "An appellate tribunal is
neither authorized nor warranted in substituting its judgment for
the judgment of the trial judge." ' " ' " (*People v. Strother* (2021)

72 Cal.App.5th 563, 571.)  " '[A] trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it.' "  (*Ibid.*)

## II. Analysis

Brinston argues that the trial court's risk analysis is not supported by substantial evidence so it abused its discretion in denying him compassionate release.  We agree.

Before turning to the trial court's analysis and the evidence in the record, we note at the outset that the statutory presumption favoring release of a defendant who meets the criteria in section 1172.2(b)(1) or (2) can only be overcome by a finding the defendant is "an *unreasonable* risk of danger to public safety."  (§ 1172.2(b), italics added.)  The Legislature's use of "unreasonable" is significant.

In *Martinez v. Board of Parole Hearings* (2010) 183 Cal.App.4th 578, 594–595, the majority applied former section 1170(e), section 1172.2's predecessor provision governing compassionate release, and concluded that the BPH had some evidence from which it could conclude that a quadriplegic defendant posed a threat to public safety if released.  (See former § 1170(e), as amended by Stats. 2007, ch. 740, § 2.)  The majority cited the defendant's "vile" offenses, denial and minimization of his behavior, extensive arrest history, and evidence that the defendant showed antisocial behavior by verbally abusing prison staff.  (*Martinez v. Board of Parole Hearings,* at pp. 594–595.)  While acknowledging that the defendant was not personally capable of hurting someone physically, the court reasoned that

13

the defendant could enlist the assistance of others to harm those who irritated him and so concluded that the BPH did not arbitrarily or capriciously deny release. (*Id.* at p. 595.) One justice dissented from this part of the decision and would have adopted a standard that the BPH could deny compassionate release of a defendant under section 1172.2's predecessor only if evidence showed a reasonable possibility of the defendant posing a threat to public safety. (*Martinez v. Board of Parole Hearings*, at p. 599 (conc. and dis. opn. of Sims, J.).) This justice would have held that there was no reasonable possibility that the quadriplegic defendant posed a threat. (*Id.* at pp. 600–603.) The majority rejoined that the Legislature could have specified a reasonableness test but did not. (*Martinez v. Board of Parole Hearings*, at p. 593, fn. 6.)

*In re Martinez* (2012) 210 Cal.App.4th 800, 803–804 was a follow up case to *Martinez v. Board of Parole Hearings,* involving the same quadriplegic defendant but arising under section 3550, the medical parole statute. Section 3550, subdivision (a) allows the BPH to grant medical parole to an incapacitated prisoner who does "not reasonably pose a threat to public safety." The Legislature enacted section 3550 shortly after *Martinez v. Board of Parole Hearings* was decided to address issues that had arisen under former section 1170(e). (*In re Martinez*, at pp. 810–812.) *In re Martinez* inferred from the timing of section 3550's enactment that the Legislature's use of "reasonably" was intended to adopt the standard proposed by the concurring and dissenting justice in *Martinez v. Board of Parole Hearings*. (*In re*

14

*Martinez*, at p. 814.) *In re Martinez* then concluded that the BPH did not have even "some evidence" to conclude that the defendant reasonably posed a risk to public safety. (*Id.* at pp. 821–822.)

The Legislature enacted section 1172.2 to amend its predecessor in former section 1170(e), make more defendants eligible for compassionate release, and save California taxpayers the cost of incapacitated inmates' medical care. (*In re Brissette*, *supra*, 112 Cal.App.5th at pp. 164–165.) When it did so, the Legislature added the word "unreasonable" to the public safety exception. (Compare § 1172.2(b) ["presumption favoring recall and resentencing . . . may only be overcome if a court finds the defendant is an unreasonable risk of danger to public safety"] with former § 1170(e)(2) & (e)(2)(B)–(C), as amended by Stats. 2021, ch. 731, § 1.3 [court could resentence or recall if it found a prisoner was permanently medically incapacitated and the conditions of release or treatment would "not pose a threat to public safety"].) We assume the Legislature was aware of the different approaches in *In re Martinez* and *Martinez v. Board of Parole Hearings*. (*Brown v. City of Inglewood* (2025) 18 Cal.5th 33, 51 [" '[T]he Legislature " 'is deemed to be aware of statutes and judicial decisions already in existence, and to have enacted or amended a statute in light thereof.' " ' "].) We will therefore construe section 1172.2(b)'s public safety exception in a realistic, common-sense manner as in *In re Martinez,* rather than the more speculative approach taken by the majority in *Martinez v. Board of Parole Hearings*.

15

The trial court characterized the BPH's findings from 2022 as close in time to its own assessment of Brinston's risk in 2025. But the BPH decision occurred almost three years before the section 1172.2 hearing. When the BPH denied Brinston parole at that hearing, it set his next parole hearing in three years' time. This indicates that the BPH itself believed three years was sufficient time for Brinston to change. The trial court gave no explanation for why it reached a contrary conclusion.

The trial court also said that Brinston was in a similar medical condition at the time of the BPH's findings. The BPH's vague description of Brinston's limitations does not support this assertion, and the record in fact indicates the opposite. From the BPH's reference in July 2022 to Brinston having had a stroke and its speculation about language or cognitive functioning issues, we can infer that Brinston was already showing early signs of what the CDCR's medical staff termed vascular dementia or a neurocognitive decline in the form of forgetfulness and expressive aphasia from recurrent strokes. But it appears that the strokes increased in number or severity after 2022, since by the time of the section 1172.2 hearing Brinston's brain MRI was "remarkable" for signs of chronic strokes and "extensive microvascular ischemic disease." The BPH noted that Brinston had tremors, but the CDCR report states that his tremor was "progressive," which suggests it continued to deteriorate. The BPH mentioned Brinston being in a wheelchair. But it did not say that Brinston's need for a wheelchair was so acute that he required a customized wheelchair and a lap belt to prevent him

16

from falling even when seated, which CDCR staff noted. Nor did the BPH mention Brinston having urinary and bowel incontinence or needing diaper changes so frequently that he was developing chronic infection of his buttocks or skin maceration on his thighs. These are significant limitations that BPH likely would have noted, so either the BPH was not aware of them or Brinston's need became more acute over time.

Moreover, the BPH failed to address entirely Brinston's most significant medical condition, his ankylosing spondylitis. The BPH must have had access to Brinston's medical records, since it was aware of his stroke history, but it did not mention a diagnosis of spondylitis. Nor did it note anything about Brinston's spine being so severely rigid that he could not turn his neck and was as stiff as a bamboo stick or mannequin. Such a condition would have been apparent to even a casual observer and surely deserving of comment, so we may infer from the silence that Brinston was not suffering from the condition at the time in 2022. But an inference is not even necessary, since the CDCR's report makes clear that the condition only became an issue after the 2022 hearing. The CDCR medical report states that Brinston's ankylosing spondylitis had "progressed" to severe rigidity. It also stated expressly, "*After 2023*, caregivers report [Brinston] has had *increasing* difficulty with all [activities of daily living] secondary to *progressive* ankylosing spondylitis rigidity." (Italics added.) Even apart from any other discrepancies or differences between the BPH and CDCR descriptions of Brinston's condition, this unambiguous statement

17

by the CDCR's medical staff refutes the trial court's statement that Brinston was in the same condition three years earlier. His condition could not be the same or similar because his ankylosing spondylitis was getting worse over time. The limitations of ankylosing spondylitis are not trivial or insignificant. The trial court therefore had no basis to conclude that Brinston was similarly situated at both hearings or rely on the BPH's assessment of Brinston's physical risk in 2022.

The trial court said that the CDCR materials attached to Brinston's request did not address whether Brinston posed a threat currently or in the future and were silent about his state of mind, thought process, or sexual deviancy. (See § 1172.2(b) [presumption favoring compassionate release can be overcome if court finds the defendant is an unreasonable risk of danger to public safety "based on the incarcerated person's current physical *and mental* condition," italics added].) This was incorrect. Most obviously, the description of Brinston's physical condition had a direct bearing on the risk he posed to public safety. But even if the trial court meant only that the CDCR materials did not address Brinston's mental condition or psychological likelihood of committing a super strike, the court was still mistaken. The CDCR's description of Brinston's chronic strokes, neurocognitive decline, forgetfulness, expressive aphasia, and vascular dementia all relate to his mental condition. Additionally, the CDCR records state that Brinston had multiple violations in prison between 2004 and 2019 for being disrespectful to staff but had received no disciplinary violations since then. This suggests that

Brinston's mental attitude had changed in recent years. The trial court seems not to have appreciated this evidence.

The trial court's lack of recognition of the breadth of information in the CDCR's records may explain its remark that it appeared that the BPH had more information available to it than the trial court did. But even if the CDCR records were less extensive than the materials available to the BPH or did not address his risk, that deficiency would not justify finding Brinston to be a risk of danger to public safety. As the People concede, because section 1172.2(b) creates a presumption in favor of recall and resentencing for defendants who satisfy the criteria in section 1172.2(b)(1) or (2), in a section 1172.2 hearing the prosecution has the burden of submitting evidence to rebut the presumption. (See *People v. Strother*, *supra*, 72 Cal.App.5th at p. 571 [under §§ 1170.18 and 1170.126, prosecution must prove by a preponderance of the evidence that a defendant poses an unreasonable risk of danger to public safety to defeat resentencing]; *Farr v. County of Nevada* (2010) 187 Cal.App.4th 669, 681 [when a presumption affects the burden of proof, the party against whom the presumption operates has the burden of proving it false].) Here, the People elected not to file any response to Brinston's petition or to submit any evidence of their own about Brinston's risk of danger to public safety. Any lack of information about Brinston's risk was therefore attributable to the People, not a basis for refusing to recall Brinston's sentence.

Given the infirmities in its factual findings, the trial court's assessment of Brinston's risk of danger to public safety cannot

19

stand. The trial court relied in part on the BPH's observations that Brinston had failed to undertake any courses or self-study about sexual offenses and lacked understanding of his own risk factors. Although not particularly close in time, this was pertinent evidence and the trial court could perhaps have credited it over the evidence in the CDCR records of Brinston's neurocognitive decline and cessation of disciplinary violations, assuming the trial court was aware of the latter evidence. The trial court also relied on the BPH's recital that Brinston had a moderate risk of violence and an elevated risk of sexual offending under the Static-99. Although neither the BPH nor the trial court said what Brinston's Static-99 score was, this evidence was likewise relevant to the trial court's determination. However, it was undercut by the fact that even in 2022 Brinston's risk of violence was downgraded from high to moderate largely because of his physical limitations at the time. Given that Brinston's physical limitations had increased significantly after 2023, one would expect his risk of violence to drop even further. His assessment of posing a moderate risk of violence in 2022 therefore had little probative value as to his risk of violence in 2025. The Static-99, as its name suggests, is based on historical or biographical factors. (*People v. Field* (2024) 106 Cal.App.5th 132, 152, fn. 8 ["The Static-99 test is an actuarial instrument that allows an evaluator to place sexual offenders in different risk categories based on historical (static) factors such as age, marital status, the number of prior offenses, the relationship of the offender to the victims and the gender of the victims."].)

Brinston's changing physical condition would therefore not affect his Static-99 score. But this cuts both ways: a Static-99 score cannot carry as much weight in the case of a defendant like Brinston whose progressively more acute physical limitations prevent him from acting on any propensities the Static-99 is designed to reveal.

Indeed, this last principle undercuts all of the trial court's analysis. Even if the trial court could reasonably conclude from the formal risk assessments or informal descriptions of Brinston's attitude by the BPH in 2022 that he was still mentally disposed to commit a super strike, a disposition to reoffend could not alone make Brinston a risk of danger to public safety. To pose an unreasonable risk, Brinston also needed to have some reasonable prospect of being able to commit the actus reus of an offense. (See *In re Martinez*, *supra*, 210 Cal.App.4th at p. 822 [to defeat medical parole under § 3550, a defendant "needs more than a mere desire to hurt someone before he reasonably poses a risk to the public. He requires the means to accomplish his desire," i.e., "the opportunity and capability to hurt someone"].) There is no such prospect in this case.

The trial court's only discussion of this issue was its speculation that Brinston might be able to act on his high risk of sexual violence because his obvious needs in a wheelchair would allow him to manipulate others into assisting him. Even if we assume that the record would support an inference that Brinston is capable of this level of manipulativeness, the scenario the trial court posited is incompatible with Brinston's physical limitations

21

as described in the CDCR medical records. According to those records, Brinston is belted into his wheelchair to prevent him from falling out, with no residual lower extremity function and contracted and stiff extremities, at risk of skin infections from his inability to even shift his weight, constantly incontinent, with chronic infection or wounds to his thighs and buttocks, unable to bend his spine or even rotate his head, and overall so rigid, like a mannequin or bamboo stick, that even those attempting to care for him have difficulty performing basic hygiene on his body. Brinston's conditions are progressive and permanent. He also suffers from chronic strokes that are affecting his memory and speech and leading to a form of dementia. The People accurately note that Brinston still has the use of his arms to feed himself, but he also has a progressive intention tremor and cannot raise his shoulders such that he can no longer write. Even assuming that Brinston were mentally capable of using his apparent helplessness to lure someone in to assist him, given the rest of his ailments, we cannot see how there is an unreasonable risk of Brinston using his limited remaining arm function to commit a super strike against that person.

Brinston is marginally more capable than the quadriplegic defendant in *Martinez v. Board of Parole Hearings* and *In re Martinez*, but his risk is similarly remote. Like the defendant in those cases, the only plausible pathway for Brinston to commit a super strike would be by speaking to others and enlisting them to act on his behalf. (*In re Martinez, supra*, 210 Cal.App.4th at p. 821.) In this vein, the People argue that the trial court

reasonably found Brinston could manipulate others into helping him commit sexual assaults. But that is not what the trial court found. The court said that Brinston could manipulate someone into helping him and then harm *that* person, not that Brinston could manipulate people into helping him commit crimes against others. The likelihood of Brinston committing a crime in concert with others is therefore purely theoretical, which does not suffice, as *In re Martinez* held under section 3550 and another Court of Appeal recently held under section 1172.2. (*In re Martinez*, *supra*, 210 Cal.App.4th at p. 822 ["Any inmate who has the ability to communicate possesses the capability to use another to act on his behalf. . . . The mere existence of this possibility, however, does not create a reasonable threat to public safety."]; *People v. Lewis*, *supra*, 101 Cal.App.5th at pp. 409–410 [defendant's "mere capacity to" solicit or aid and abet a crime "has no tendency to prove that it is likely, let alone that there is an unreasonable risk, that he will actually engage in such conduct," given his criminal history].)

In sum, notwithstanding his abhorrent criminal past, failure to demonstrate insight or empathy as recently as three years ago, and psychological tendency to reoffend, Brinston's severely restricted physical condition — coupled with the total lack of evidence of efforts to manipulate others to engage in criminal activity at his behest — means that he cannot present an unreasonable danger of committing a super strike offense against anyone. The trial court therefore abused its discretion in finding that Brinston posed an unreasonable risk of danger to

23

public safety that overcame the presumption favoring his compassionate release under section 1172.2(b).[5]

## DISPOSITION

The trial court's order denying Brinston's request under section 1172.2 is reversed.

BROWN, P. J.

WE CONCUR:

STREETER, J.
GOLDMAN, J.

*People v. Brinston* (A173470)

---

[5] The trial court at one point misstated the governing statute as section 1172.7 instead of section 1172.2, and, apparently following the parties' lead, described the standard as requiring a finding of danger to public safety by clear and convincing evidence.  The parties on appeal do not address these misstatements, so we do not include them in our analysis.

24

Trial Court:       Sonoma County Superior Court

Trial Judge:       Hon. Laura Passaglia

Counsel:           Jonathan Soglin and Olivia M. Gee, under
                   appointment by the Court of Appeal, for
                   Defendant and Appellant.

                   Rob Bonta, Attorney General, Charles C.
                   Ragland and Jeffrey M. Laurence, Assistant
                   Attorneys General, Eric D. Share, Molly A.
                   Smolen, and Timothy Moore, Deputy Attorneys
                   General for Plaintiff and Respondent.